## THOMPSON *v.* TUCKER-OSBORN.

1. SPECIFIC PERFORMANCE—ANTENUPTIAL CONTRACTS.
   A court of equity has jurisdiction to enforce the specific performance of an antenuptial contract.

2. SAME—DEFINITENESS.
   An antenuptial contract for the support of the wife from her husband's estate by providing a home and such amount monthly or quarterly as may enable her to live in comfort, "and equal to such as she has previously enjoyed," and, in case of sickness, for such added amount as may be necessary for care, medical attendance, and other necessary expenditures, and at her death for funeral expenses, such allowance to be in lieu of all rights of dower and all rights in the personal estate of the husband, is sufficiently specific to be capable of enforcement.

3. SAME—WILLS—ADEQUATE PROVISION.

>    The requirements of such contract are met by a will devising to the wife (who was before the marriage a woman without means) a life estate in the home farm, after taking off a part devised to a nephew, with, the right to firewood from the latter part, and giving her absolutely the household furniture, two horses, two phaetons, and harnesses, and placing $5,000 in trust for her use, to be paid "from time to time," as her necessities may demand; and, such provision having been made, the widow may be compelled in equity to release her dower rights.

Appeal from Lenawee; Lane, J.   Submitted November 19, 1896.   Decided January 5, 1897.

Bill by Gamaliel I. Thompson, executor of the will of John M. Osborn, deceased, and others, against Sarah A. Tucker-Osborn, for the specific performance of an antenuptial contract.   From a decree dismissing the bill, complainants appeal.   Reversed.

*Fellows & Chandler* and *Watts, Bean & Smith*, for complainants.

*F. A. Lyon* and *L. R. Pierson*, for defendant.

LONG, C. J.   On October 3, 1891, John M. Osborn married the defendant.   Mr. Osborn was at this time upwards of the age of 70 years.   He had been married twice before; had retired from the banking business some years before; was suffering from a lingering disease. He had, some time before this, submitted to an operation, by which a part of one of his feet had been removed.   It was well known by his friends and those associated with him that it was a disease which must prove fatal in the near future, and was known as "senile gangrene."   The defendant had been in Mr. Osborn's employ as a servant woman and housekeeper for something like six years before the marriage.   She had never been married, and, prior to the time she commenced working for Mr. Osborn, had supported herself by going out to service.   On the

16th day of September, before the marriage, Mr. Osborn, evidently in contemplation of the marriage, drew in duplicate an antenuptial contract, as follows:

"This antenuptial contract or agreement, made this 16th day of September, A. D. 1891, between John M. Osborn, party of the first part, and Sarah A. Tucker, party of the second part, both of the township of Pittsford, county of Hillsdale, and State of Michigan, witnesseth: That the party of the first part, for the reason of a marriage to be consummated between and by the first and second parties hereinbefore named, does hereby agree and promise that said second party shall be supported from the estate of which I may die possessed for the term of her natural life, said support to be by providing a home and such an amount monthly or quarter-yearly as may be necessary to enable her to live in comfort, and equal to such as she has heretofore enjoyed, and, in case of sickness, such added amount as may be necessary for care, medical attendance, and other necessary expenditures. The party of the second part, in consideration of the above-named provisions for support, hereby accepts the same as marriage settlement, and hereby waives all rights in a will now made by first party, and all rights of dower of real estate, and all rights in the personal estate of which said first party may die possessed. It is hereby further agreed between said parties that the delivery of this contract, duly signed, shall be a bar from any claim from either party as to services, money, or support, or any other claim whatever existing at the time this contract shall be executed. It is further agreed that funeral expenses and rights of burial are considered as an inherent part of this contract. It is further agreed that this contract holds good only so long as second party shall remain the widow of said first party. The above contract is in duplicate, one retained by each party.

"In witness of the above, the parties thereto hereby subscribe their names and affix their seals, this 30th day of September, A. D. 1891.

"JOHN M. OSBORN.    [L. S.]
"SARAH A. TUCKER.    [L. S.]

"Witnesses:
    "S. VAN ETTA.
    "H. S. VAN ETTA."

On the 30th day of September, three days before the marriage, this contract was signed in duplicate by the parties, in the presence of two witnesses. One of these contracts was placed in an envelope marked "John M. Osborn, Personal Matter," in Mr. Osborn's handwriting. The other was placed in an envelope marked "Sarah A. Tucker." Both envelopes were sealed, and placed in an envelope which was marked "John M. Osborn's Will," and were left in a trunk with Mr. Thompson, who was formerly partner of Mr. Osborn, at Mr. Thompson's bank.

Before Mr. Osborn's death, he executed a will, clause 2 of which, it is claimed, was made for the purpose of carrying out the terms and provisions of said antenuptial contract, and is as follows:

"*Second.* I give, devise, and bequeath to my good wife, Sarah A. Osborn, the occupancy, use, income, and profits of all the residue of my said homestead farm which is left after deducting such thereof as I have given and devised to my nephew, said Gamaliel O. Baker, in the first clause of this, my will, for and during the term of her natural life, with the right to have, during her occupancy thereof, her necessary firewood from that part of my homestead farm devised in the first clause of this, my will, to Gamaliel O. Baker, as an estate for life, but not to commit any waste thereof. Also, I give, devise, and bequeath to my said wife, Sarah A. Osborn, to be hers absolutely, all my household goods and my mare, named Nelly, and my sorrel-colored horse, named Dan, and my two phaetons, and the two single harnesses, blanket, and whip used with them; also the jack used to oil the phaeton with. Also, I place in trust in the hands of my executor the sum of five thousand dollars, to be used according to the good judgment and discretion of my executor, so much thereof as may from time to time be necessary, in with my other devises and bequests to her, for her comfortable support in health and sickness during her natural lifetime, and for her funeral expenses; but, if my said wife shall again marry, then, from and after the date of her marriage, said support, and also her rights of occupancy, use, and enjoyment of the land and premises hereinbefore devised to her, shall cease and be ended, and the same shall then revert; and it

is my intention and my will that the provisions that I have made for my said wife in this, my last will and testament, shall be received and accepted by her in full satisfaction and bar of dower in all my real estate."

Mr. Osborn died on the 9th day of December, 1893, and his will was admitted in regular form to probate.

Previous to the making of this antenuptial contract, and on October 22, 1889, Mr. Osborn gave the defendant a paper which, together with the indorsement thereon, is as follows:

"$500.

"One year from date, for value received, I promise to pay Sarah A. Tucker five hundred dollars, the same to be paid to the above only, not transferable by assignment or descent of property.

"JOHN M. OSBORN.

"HUDSON, MICH., October 22, 1889."

Indorsed thereon:

"I hereby extend the within note on the terms as stated therein, payable at any time, at the option of J. M. Osborn or by his estate when settled.

[Signed] "SARAH A. TUCKER."

The indorsement was made before the antenuptial contract, and before the marriage.

These are the facts as claimed by complainants, and as found by the court to be true upon the hearing of said cause in open court. After the probate of the will and the appointment of commissioners on said estate, the defendant, repudiating the contract, and denying the validity thereof, and refusing to accept the provisions made for her in said will, presented said note to the commissioners, as a claim against the estate of the deceased, and had the same allowed, from which allowance John M. Baker, one of the complainants, appealed to the circuit court for the county of Hillsdale, where said appeal is still pending. Defendant also brought suit in the circuit court for the county of Hillsdale, in ejectment, to recover what she claimed to be her dower estate in the land owned by the

deceased in Hillsdale county, and also brought suit in the circuit court for the county of Lenawee, in ejectment, to recover what she claimed to be her dower estate in the land owned by the deceased in that county at the time of his death. The executor named in said will, and the other complainants (legatees named in said will), filed this bill, asking for a specific performance of said antenuptial contract, and to restrain the defendant from further prosecuting her claim before the commissioners and the ejectment suits. The testimony was taken in open court, and on March 14, 1896, the court entered a decree dismissing the bill, but finding the following facts:

"*First.* That John M. Osborn died at the time alleged in said bill of complaint, the owner of the real estate described and set forth in said bill of complaint.

"*Second.* That on the 30th day of September, 1891, the said John M. Osborn and said Sarah A. Tucker (now Sarah A. Tucker-Osborn, the defendant in this suit) made, executed, and delivered the antenuptial contract set forth and described in said bill of complaint.

"*Third.* That said antenuptial contract was made by the said parties with a full understanding of its objects, effects, and purposes.

"*Fourth.* That the said Sarah A. Tucker was then possessed of such information by which she knew the extent and value of the property of said John M. Osborn.

"*Fifth.* That the said John M. Osborn and said Sarah A. Tucker afterwards intermarried.

"*Sixth.* That the said John M. Osborn, in his lifetime, made and executed the will set forth and described in said bill of complaint.

"*Seventh.* That the provisions therein named for the said Sarah A. Tucker-Osborn were made by the said John M. Osborn for the purpose of carrying out said antenuptial contract.

"*Eighth.* That said provisions in said will do not fully carry out the terms of said antenuptial contract.

"*Ninth.* That said antenuptial contract is not sufficiently specific in its terms for this court to decree a specific performance thereof.

"*Tenth.* That said antenuptial contract cannot operate to bar dower."

From this decree, complainants appeal.

1. Defendant contends that the court was in error in the findings of fact, and that, in any event, the bill was properly dismissed. We cannot agree with this contention. We are satisfied from the evidence that the antenuptial contract was made between the parties and delivered, as claimed by the complainants, and that it was made with a full understanding between them of its object and purposes, and that the defendant well knew the extent and value of the property of John M. Osborn; neither have we any doubt but that John M. Osborn intended to fully carry out the provisions of the contract by clause 2 of his will above set out. It would be of no interest to the parties or the profession to set out the testimony in full upon which we reach these conclusions. They are the conclusions of the court below, who heard the testimony, and we cannot well see how any other result could be reached, under the evidence in the case.

2. It is further contended that, in any event, the court was correct in finding that the antenuptial contract could not be enforced, for the reasons:

(a) That the court had no jurisdiction.
(b) That the contract is void on its face.
(c) That it could not bar dower.
(d) That it is not sufficiently specific to be enforced.
(e) That the will does not carry out the terms of the contract.

A marriage between parties who have previously made a contract with each other, to be performed presently or during the marriage, releases or extinguishes such contract. Such contracts, however, when made in contemplation of marriage, and respecting the property of either of the parties, though released or extinguished at law, are held good in equity, and will be enforced by a court of chancery against the heirs of the party in default. *Miller* v. *Goodwin*, 8 Gray, 542. As stated by Mr. Schouler in his work on Domestic Relations (section 173):

"In this country the validity of marriage settlements is generally recognized; and it is well understood that almost any *bona fide* and reasonable agreement, made before marriage, to secure the wife either in the enjoyment of her own property or a portion of that of her husband, whether during coverture or after his death, will be carried into execution in chancery."

In *Stilley* v. *Folger*, 14 Ohio, 610, 649, the court said:

"All supposed actual fraud may be laid out of view. Why should not this agreement be enforced? Antenuptial contracts have long been regarded as within the policy of the law, both at Westminster and in the United States. They are in favor of marriage, and tend to promote domestic happiness by removing one of the frequent causes of family disputes,—contentions about property, and especially allowances to the wife. Indeed, we think it may be considered as well settled at this day that almost any *bona fide* and reasonable agreement, made before marriage, to secure the wife in the enjoyment either of her own separate property or a portion of that of her husband, whether during the coverture or after his death, will be carried into execution in a court of chancery."

In *Paine* v. *Hollister*, 139 Mass. 144, a bill was filed by the executor to enjoin the widow from prosecuting a petition in the probate court for an allowance out of the husband's estate, setting up the fact that the defendant had entered into an antenuptial contract whereby she had agreed to accept a certain provision in lieu of dower, or any allowance or distributive share in the estate of her husband. There the court said:

"There is no doubt that the contract is lawful in its general features; that it was not extinguished by the marriage of the parties; and that a resort to equity is proper to enforce it."

The same principle is recognized in equity in *Tarbell* v. *Tarbell*, 10 Allen, 278; *Jenkins* v. *Holt*, 109 Mass. 261; *Blackinton* v. *Blackinton*, 110 Mass. 461; *Sullings* v. *Richmond*, 5 Allen, 187 (81 Am. Dec. 742); *Collins* v. *Collins*, 72 Iowa, 104; *McNutt* v. *McNutt*,

116 Ind. 545. In a note to the last case cited, as reported in 2 L. R. A. 372, it is said:

"Executory agreements made between a man and a woman, who afterwards marry, and which then become void at the common law, in the application of the conscientious principles of equity, will be specifically enforced against either husband or wife at the suit of the other."

This doctrine has been fully recognized in this court in *Phillips* v. *Phillips*, 83 Mich. 259.

It is therefore well settled that a court of chancery has jurisdiction to determine the questions here presented, and that the parties are in the proper forum.

But it is claimed that such a contract would not bar dower in the lands of the husband. It is not contended that the contract *ipso facto* operated as a bar to her dower, like a jointure or pecuniary provision settled upon her in accordance with the terms of sections 5746–5749, 2 How. Stat., but that it was an executory agreement between the parties, and that, when performed by Mr. Osborn or those representing him, the court will compel the defendant to specifically perform her part of the contract, and release her dower right; and that the making of the will was performance on the part of Mr. Osborn. If the contract is so specific that its performance may be decreed, and the will operates to carry out the agreement on the part of Mr. Osborn, we have no doubt of the correctness of this contention. *Dakin* v. *Dakin*, 97 Mich. 284. That the defendant entered into the contract we have no doubt, fully understanding its terms and the financial condition of Mr. Osborn. She had been an inmate of his house for several years. There seems to have been made ample provision for her support and maintenance by the contract, and such as was satisfactory to her. But it is said that it is not sufficiently specific, and for that reason it cannot be enforced. The contract provides for her support from the estate by providing a home and such amount monthly or quarter-yearly as may enable her to live in comfort, and equal to such

as she has heretofore enjoyed, and, in case of sickness, such added amount as may be necessary for care, medical attendance, and other necessary expenditures, and, at her death, funeral expenses and rights of burial. These amounts are easily ascertainable. Her former mode of life was to be taken into consideration in fixing what the home should be, as well as the allowance to be made. She was a woman without means at the time this contract was made, and in the employ of the deceased as housekeeper. Before that time she was there in the capacity of a house servant. In *Collins* v. *Collins*, 72 Iowa, 105, the contract provided that—

"E. A. Collins [the husband] does by these presents agree to, and does hereby, settle upon Maria, out of his estate, a sufficient amount to keep and maintain her during her life, or as long as she remains his widow. The said amount so to be furnished shall be sufficient to maintain said Maria in such circumstances and in such manner as the estate of said Collins, Sr., will justify, and as would be reasonable to be furnished by a party or an estate in like financial circumstances."

The court decreed specific performance, and fixed the amount that would be reasonable under all the circumstances.

In *Jacobus' Ex'r* v. *Jacobus*, 20 N. J. Eq. 49, it was held that it was within the power of a court of equity to determine what a good and sufficient support was, and to direct its payment. In *Preston Nat. Bank of Detroit* v. *George T. Smith Middlings Purifier Co.*, 84 Mich. 364, a contract less specific than the present one was enforced by this court.

Did the will fully carry out the terms of the contract? By the will, the defendant was given what was left of the home farm, after taking off the part left by the will to a nephew, with the right to firewood from the part devised to the nephew. She was also given absolutely the household furniture, two horses, two phaetons, etc. Deceased then placed the sum of $5,000 in trust in the hands of his

executor for her use, and to be paid from time to time, as her necessities demanded.   It is true that the payments, by the terms of the will, were not in exact accord with the terms specified in the contract,—that is, monthly or quarterly,—but from time to time; and there is nothing in the case showing that it will not be paid in accordance with the contract.   It cannot be said that the will does not carry out the terms of the contract, and meet the requirements of it.   The court below was in error in holding that the contract was not specific enough to be enforced, and that the will did not carry out its terms.

The decree below must be reversed, and a decree entered here, granting the prayer of the bill.   No costs of this court will be allowed to either party.

The other Justices concurred.