CALHOUN COUNTY v BLUE CROSS BLUE SHIELD OF MICHIGAN

Docket No. 303274. Submitted May 2, 2012, at Lansing. Decided June 5,
     2012, at 9:00 a.m. Leave to appeal denied, 493 Mich 917.

    Calhoun County brought an action in the Calhoun Circuit Court
    against Blue Cross and Blue Shield of Michigan, the administrator
    of its self-insured health care plan, in connection with what the
    parties termed an "access fee" that defendant charged plaintiff to
    cover the costs of an insurance subsidy that defendant was legally
    obligated to provide to certain Medicare-eligible people. The five-
    count complaint—which alleged two counts of breach of contract
    and one count each of breach of fiduciary duty, conversion, and
    constructive fraud—asserted that plaintiff had not agreed to pay
    the access fee, that the access fee had been fraudulently concealed,
    and that the access fee was unenforceable because the amount
    charged was not specified, determinable, or reasonable. The court,
    James H. Fisher, J. (sitting by assignment), initially denied both
    parties' motions for summary disposition but, on reconsideration,
    granted plaintiff's motion for summary disposition with respect to
    one count of breach of contract and the claim for breach of
    fiduciary duty. The court further ruled that the factual question
    whether defendant had fraudulently concealed the access fee from
    plaintiff would be submitted to a jury in order to determine
    whether plaintiff could recover damages beyond the applicable
    period of limitations. Plaintiff voluntarily dismissed the three
    remaining claims. After a jury found that defendant had not
    fraudulently concealed the access fee from plaintiff, the court
    entered a judgment of $1,138,943 in plaintiff's favor. Defendant
    appealed.

        The Court of Appeals *held*:

        1. The trial court erred by granting plaintiff summary dispo-
    sition of its breach-of-contract claim on the basis that the contract
    was missing an essential term. There are five elements of a valid
    contract: (1) parties competent to contract, (2) a proper subject
    matter, (3) a legal consideration, (4) mutuality of agreement, and
    (5) mutuality of obligation. The parties to a contract must have a
    meeting of the minds on all essential terms of a contract as judged
    by an objective standard based on the parties' express words and

visible acts. The failure to specify in the contract the actual dollar amount of the access fee did not render that contract term indefinite. Judicial avoidance of contractual obligations because of indefiniteness is not favored. When the promises and performances of each party are set forth with reasonable certainty, the contract will not fail for indefiniteness even if some terms are incomplete or indefinite as long as the parties intended to be bound by the agreement, particularly if one of the parties has rendered partial or full performance. If the price is indefinite, the purchaser may be required to pay and the seller required to accept a reasonable price. The parties in this case agreed to all the terms of a main administrative services contract, which expressly provided for the collection of additional fees in accordance with defendant's standard operating procedures, as well as to the terms of an incorporated schedule that reflected the parties' agreement that the access fee would covered three specific costs or charges, including the subsidy at issue. Consequently, the parties agreed to the payment of the access fee, what it covered, and how it would be paid.

2. The contract's failure to specify a dollar amount for the access fee did not make the fee unenforceable. The parties had specifically agreed to what comprised the access fee and how it was to be paid, and the amount was reasonably ascertainable through defendant's standard operating procedures, which included an objective formula for calculating the fee. Had plaintiff wanted to determine this amount, it could have done so through the contractual annual audit.

3. Defendant was entitled to summary disposition of plaintiff's claim for breach of fiduciary duty because, even assuming that defendant owed plaintiff a fiduciary duty, the alleged breach resulted from defendant's charging a fee that it was contractually entitled to charge.

Reversed and remanded for entry of an order granting defendant's motion for summary disposition of plaintiff's claims for breach of contract and breach of fiduciary duty.

1. Contracts — Elements.

The elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation; for a contract to be enforceable, the parties must have a meeting of the minds on all the essential terms when judged by an objective standard based on the parties' express words and visible acts.

2. CONTRACTS — INDEFINITENESS — FAILURE TO SPECIFY COST AMOUNT.

> A contract will not fail for indefiniteness when the promises and performances of each party are set forth with reasonable certainty even if some terms are incomplete or indefinite as long as the parties intended to be bound by the agreement, particularly if one of the parties has rendered partial or full performance; if the price is indefinite, for example, the purchaser may be required to pay and the seller required to accept a reasonable price, and if the time of performance is indefinite, performance may be required to be rendered within a reasonable time; a contractual fee may be enforceable despite the contract's failure to specify its dollar amount if the promises and performances to be rendered by each party were set forth with reasonable certainty.

3. ACTIONS — BREACH OF FIDUCIARY DUTY — FIDUCIARY RELATIONSHIPS.

> A fiduciary relationship is a relationship in which one person is under a duty to act for the benefit of the other on matters within the scope of the relationship; fiduciary relationships usually arise (1) when one person places trust in the faithful integrity of another who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer.

*Giarmarco, Mullins & Horton, P.C.* (by *William H. Horton* and *Elizabeth A. Favaro*), and *Richard C. Lindsey, Jr.*, Corporation Counsel, for plaintiff.

*Bodman PLC* (by *James J. Walsh* and *Rebecca D'Arcy O'Reilly*) and *Leo A. Nouhan* for defendant.

Before: FITZGERALD, P.J., and MURRAY and GLEICHER, JJ.

MURRAY, J. Defendant Blue Cross and Blue Shield of Michigan appeals as of right a final judgment entered in favor of plaintiff, Calhoun County, in the amount of $1,138,943. Defendant's appeal challenges several pre-

liminary rulings made by the trial court when deciding the parties' cross-motions for summary disposition, as well as the trial court's denial of defendant's motion to amend its affirmative defenses. We reverse the trial court's order granting plaintiff summary disposition on its breach-of-contract and fiduciary-duty claims and remand for entry of an order granting defendant's motion for summary disposition of those claims.

## I. FACTUAL BACKGROUND[1]

This case is one of a series involving defendant and various governmental entities. Calhoun County has for years contracted with defendant to administer its self-insured health care plan. Defendant is governed by various Michigan statutes and is legally obligated to subsidize insurance policies for any Medicare-eligible person who is not a member of a "group." Defendant internally refers to this subsidy as "other than group" (OTG). Defendant is also required to maintain a contingency fund and ensure that each "line of business" is independently funded. Defendant's self-insurance plan is one "line of business."

In the late 1980s, defendant separately billed its customers for the cost of the OTG subsidy. Many self-insured customers were dissatisfied with paying the OTG charge; as a result, some customers hired defendant's competitors, while others simply refused to pay the OTG charge. Defendant ultimately decided to merge mandatory business charges such as the OTG charge into the hospital claims for self-insured plans. Thus, the various business charges were no longer

---

[1] The material facts are taken from plaintiff's complaint and the parties' motions for summary disposition. To the extent we have utilized some *nonmaterial* facts brought forward at trial, it has only been to provide some context to the circumstances giving rise to this case.

"visible" on billing statements, but were instead built into the bill submitted to the customer (after a reduction had already occurred because of defendant's network discounts). According to defendant, these built-in charges were part of an access fee that was structured in part as the cost for access to defendant's hospital network discounts.

## II. THE CONTRACT BETWEEN THE PARTIES

Since 1990, plaintiff has contracted with defendant to administer plaintiff's self-insured health care plan. Pursuant to the parties' agreement, plaintiff reimburses defendant on a weekly basis for the medical claims submitted by its employees. This weekly payment includes the costs of actual claims (which, as noted, are initially reduced by defendant's network savings) and some additional fees. The amount of the payment is determined by the parties' administrative services contract (ASC). The ASC is the central contract for the insurance arrangement, and it determines the rights and obligations of each party.

The ASC outlined plaintiff's financial responsibilities as follows:

### A. General Obligations.

The Group[2] will immediately assume: all risks; all financial obligations, including but not limited to Amounts Billed, court costs, and attorney's fees; and all other liabilities BCBSM may assume or which might otherwise attach with respect to processing Coverage pursuant to this Contract. The Group will make full payment and satisfaction to BCBSM for all amounts resulting from such risks, financial obligations, and liabilities. Group responsibility will not, however, include amounts resulting directly from any negligent processing/payment of claims by BCBSM.

---

[2] "The Group" refers to plaintiff.

**B. Specific Obligations.**

*The Group will,* for each Contract Year, *pay BCBSM the total of the following amounts:*

1. *Amounts Billed* during the current Contract Year.

2. The hospital prepayment reflecting the amount BCBSM determines is necessary for its funding of the prospective hospital reimbursement.

3. The actual administrative charge.

4. The group conversion fee.

5. Any late payment charge.

6. Any statutory and/or contractual interest.

7. Stop Loss premiums, if applicable.

8. Cost containment program fee, if applicable.

9. Any other amounts which are the Group's responsibility pursuant to this Contract, including but not limited to risks, obligations or liabilities, deficit amounts relating to previous agreements, and deficit amounts relating to settlements.

*The Provider Network Fee,* contingency, *and any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner as authorized pursuant to 1980 P.A. 350* [*MCL 550.1101* et seq.] *will be reflected in the hospital claims cost contained in Amounts Billed.* [Emphasis added.]

The ASC defined "Amounts Billed" as "the amount the Group owes in accordance with BCBSM's standard operating procedures for payment of Enrollees' claims" and "Provider Network Fee" as "the amount allocated to the Group for the expenses incurred by BCBSM in the establishment, management and maintenance of its participating hospital, physician and other health care provider networks." The ASC expressly incorporated additional documents, including schedules, and contained a severability clause.

Each year the parties agreed to a new fee for defendant's administrative services, which was typically detailed in a document titled "Schedule A." The Schedule As included an "administrative charge" and a fee for "excess loss coverage" or "stop-loss coverage." The 1994 Schedule A also contained the following provision:

> 8. Effective with your current renewal, your hospital claims cost will reflect certain charges for provider network access, contingency, *and other subsidies as appropriate*. [Emphasis added.]

The Schedule As from 1995 to 2006 contained a substantially similar provision, stating either, "Your hospital claims cost reflects certain charges for provider network access, contingency, and other subsidies as appropriate," or something quite similar, while the 2007 Schedule A contained a more detailed provision acknowledging the agreed-upon fees and charges:

> 11. *A portion of your hospital savings has been retained by BCBSM to cover the ASC Access Fee. The ASC Access Fee covers* (a) costs associated with the establishment, management and maintenance of BCBSM's participating hospital, physician and other health provider networks, (b) charges to help maintain BCBSM's surplus at an appropriate level in compliance with regulatory and Blue Cross and Blue Shield Association standards, and (c) *cost transfer subsidies or surcharges authorized pursuant to 1980 P.A. 350, such as the group conversion fee and the 'other than group' subsidy*. [Emphasis added.]

The access fee[3] varied based upon projected business costs. The access fee was a fixed percentage of each hospital claim, and during separate litigation defendant produced a document titled "Development of Access Fee

---

[3] Although the contract denotes this fee as the "ASC Access Fee," the parties mostly refer to it as the "access fee." We will do the same.

Factors" that purportedly reflected defendant's formula for calculating the access fee.

### III. PROCEDURAL HISTORY

Plaintiff's complaint contained two counts alleging breach of contract as well as additional counts alleging breach of fiduciary duty, conversion, and constructive fraud. In general, each of plaintiff's allegations centered on the assertion that the parties had not agreed to a price for the access fee and, even if they had, defendant unilaterally charged excessive fees in violation of the parties' agreement. In particular, with respect to its first breach-of-contract claim, plaintiff alleged that there was no agreement between the parties on the access fee because the lack of a stated price made the term so vague that no contract regarding that fee existed:

> 19. The contractual relationship between the parties is governed by two documents — the Master Contract and the yearly Schedule A. Plaintiff agreed to pay Defendant an Administrative Fee and Stop Loss Coverage. Plaintiff did not agree to pay Defendant an ASC Access Fee or other fee other than an Administrative Fee and Stop Loss Coverage. To the extent that the Master Contract or Schedule A make reference to charges for "provider network access, contingency and other subsidies as appropriate," *that provision is so vague, uncertain or ambiguous that an enforceable contract does not exist regarding that fee.* The amount, price or method to determine the amount or the price is absent. [Emphasis added.]

Plaintiff's second breach-of-contract claim asserted that if there was a contract regarding the fees, defendant violated the covenant of good faith and fair dealing by unilaterally determining the fee, which was unreasonably high.

After initially denying both motions for summary disposition, the trial court held a second hearing just prior to trial to reconsider the competing motions for summary disposition.[4] The trial court set forth several legal conclusions in support of its decision to grant plaintiff's motion:

> And what I've come up with is this: that the Plaintiff's theory in this case is that there is--that the contract between the parties provides for an access fee but provides for an indefinite means of determining what that fee will be. And so in looking at the contract language, it seems to me that there isn't--as a matter of law there is no agreement on what the price term was for the access fee.
>
> And the Plaintiff's counsel has presented a line of cases that indicate in that instance that that part of the contract providing for an access fee is unenforceable, which leads one to the conclusion that the Defendant is not allowed to charge an access fee. They did charge it. And so the only factual issue remaining for the jury is to determine if there was the issue of fraudulent concealment and how far back the Plaintiff can go with their claim for reimbursement of the access fee that the Defendant has already collected.
>
> The Defendant's theory of the case is that there was definitely an agreement for an access fee. There is a means for determining it even if it refers to the Defendant's standard operating procedure or other what I would term indefinite terms, and even if there--but even if the price is indefinite in nature, that the Defendant has not been harmed because the Defendant should be able to show that there certainly was an agreement for an access fee, and they ought to be able to present evidence about what that fee would or should have been worth. Really it strikes me as a *quantum meruit* type of analysis.
>
> In any event, I told the attorneys I've decide--I'm

---

[4] Defendant's motion was filed in lieu of an answer and was filed pursuant to MCR 2.116(C)(8). Plaintiff's motion for partial summary disposition was brought pursuant to MCR 2.116(C)(10) and sought judgment only on its breach-of-contract claims.

deciding this legal issue in favor of the Plaintiff. So that gets us down to only one real factual issue, determining-- and that is determining when [plaintiff] knew or should have known of the existence of this claim. And then that will determine how far back they can go.

The trial court then ruled that defendant was plaintiff's fiduciary as a matter of law:

Another part of this case is the allegation that the Plaintiff breached a fiduciary--or the Defendant breached a fiduciary duty it owed to the Plaintiff. The Defendant is asserting that's an issue of law. I agree with that. And I'm determining based on what's been presented already that's not contested that there was a fiduciary duty, and that's because the Defendant was receiving health care claims from health care providers for the Defendant's employee, acting as their agent and paying those claims, accounting for those things to the Plaintiff, and then billing the Plaintiff for those items.

And [defendant's counsel] correctly pointed out that there has to be a scope to that duty, and, as I see it, the scope of the duty was simply to bill the Plaintiff accurately for claims that were presented. And so the part of this case that's troubling to me is that bills were presented to the Plaintiff that said we paid X number of dollars of health care claims for your employees over the past year, with no disclosure that some percentage of those payments were actually this access fee that was never disclosed--at least prior to 2006 was never clearly disclosed by the Defendant to the Plaintiff.

So I'm ruling as a matter of law on that issue. So I believe the only remaining issue is the issue of fraudulent concealment.

The trial court ultimately entered an order granting partial summary disposition to plaintiff on the breach-of-contract and breach-of-fiduciary-duty claims, and plaintiff later voluntarily dismissed the remaining three claims. Defendant moved to add a counterclaim

for quantum meruit and return of its consideration, which the trial court denied.[5]

## IV. ANALYSIS

Defendant argues that the trial court erred in denying its motion for summary disposition of plaintiff's breach-of-contract claims. Defendant's argument is two-fold. First, defendant argues that the access fee was specific enough that the contract did not fail for indefiniteness. Second, defendant argues that even if the contract was ineffective, the remedy would not be liability for breach of a contract, but would instead be a ruling that the failure of consideration caused there to be no contract between the parties.

This Court reviews de novo the grant or denial of a motion for summary disposition filed under MCR 2.116(C)(10). *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When a motion is brought under that subrule, the trial court must consider the "affidavits, together with the pleadings, depositions, admissions, and documentary evidence then filed in the action or submitted by the parties," MCR 2.116(G)(5), "in the light most favorable to the party opposing the motion," *Maiden*, 461 Mich at 120. "Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Id*. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open

---

[5] A three-day jury trial was conducted to determine whether defendant had fraudulently concealed the access fee from plaintiff. If the jury had found in plaintiff's favor, plaintiff would have been able to recover damages for the breach of contract beyond the applicable statute of limitations. However, after one hour of deliberations, the jury found that defendant had not fraudulently concealed the access fee from plaintiff.

an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

In addressing the validity of the trial court's decision, both parties cite evidence produced at the trial held on the fraudulent-concealment issue. Much of that evidence, and of course all the trial testimony, was not available to the trial court when it decided the motions for summary disposition prior to trial. Consequently, we cannot look to that evidence in determining whether the trial court properly granted the motion. *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 313 n 4; 660 NW2d 351 (2003); *Zurcher v Herveat*, 238 Mich App 267, 292; 605 NW2d 329 (1999). Instead, we are limited to considering the evidence submitted to the trial court before its decision on the motions. *Zurcher*, 238 Mich App at 292.

### A. WAS THERE A CONTRACT?

With respect to plaintiff's first breach-of-contract claim, defendant's primary argument is that the trial court erred in granting partial summary disposition to plaintiff on the basis that the contract was missing an essential term. Construction and interpretation of a contract are questions of law that we review de novo, meaning that we do so without deference to the trial court's decision. *Comerica Bank v Cohen*, 291 Mich App 40, 46; 805 NW2d 544 (2010). In *Meagher v Wayne State Univ*, 222 Mich App 700, 721-722; 565 NW2d 401 (1997), this Court explained:

> Under ordinary contract principles, if contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposi-

tion is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. The language of a contract should be given its ordinary and plain meaning. [Citations omitted.]

There are five elements of a valid contract: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Hess v Cannon Twp*, 265 Mich App 582, 592; 696 NW2d 742 (2005) (quotation marks and citation omitted). Most of the elements listed above reflect the fact that the parties to a contract must have "a meeting of the minds on all essential terms of a contract." *Burkhardt v Bailey*, 260 Mich App 636, 655; 680 NW2d 453 (2004). "Where mutual assent does not exist, a contract does not exist." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 372; 666 NW2d 251 (2003).[6] " 'A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind.' " *Stanton v Dachille*, 186 Mich App 247, 256; 463 NW2d 479 (1990), quoting *Heritage Broadcasting Co v Wilson Communications, Inc*, 170 Mich App 812, 818; 428 NW2d 784 (1988).

There is no dispute that elements one and two have been satisfied, i.e., that the parties were competent to contract and that the contract involved a proper subject matter. The parties also do not seem to dispute that there was legal consideration supporting the contract. The essence of consideration—whatever form it takes—is that there be a bargained-for exchange be-

---

[6] " 'Meeting of the minds' is a figure of speech for mutual assent." *Kamalnath v Mercy Mem Hosp Corp*, 194 Mich App 543, 548-549; 487 NW2d 499 (1992).

tween the parties. *Higgins v Monroe Evening News*, 404 Mich 1, 20; 272 NW2d 537 (1978). Typically, consideration will, at least for one side of the contract, take the form of the payment of legal tender. See *Timko v Oakwood Custom Coating, Inc*, 244 Mich App 234, 244; 625 NW2d 101 (2001). Here, there is no question that legal consideration supported the contract. Defendant agreed to administer plaintiff's self-insured health care plan, and in return plaintiff agreed to compensate defendant with the payment of legal tender. And finally, there is no dispute that the parties mutually agreed to be bound to these respective rights and obligations. Consequently, and as plaintiff repeatedly states in its brief on appeal,[7] a contract existed between the parties.

Despite the concession that a valid contract existed between the parties, plaintiff's breach-of-contract claim asserts that the failure to specify in the contract the actual dollar amount of the access fee rendered that "contract term" indefinite. In addressing this issue, we are ever mindful that judicial avoidance of contractual obligations because of indefiniteness is not favored under Michigan law, and so when the promises and performances of each party are set forth with reasonable certainty, the contract will not fail for indefiniteness. *Nichols v Seaks*, 296 Mich 154, 159; 295 NW 596 (1941).

In accordance with this principle, the absence of certain terms—including at times the price—does not necessarily render a contract invalid. Some 40 years ago, in *J W Knapp Co v Sinas*, 19 Mich App 427,

---

[7] Plaintiff states its position this way in its brief on appeal: "The parties agree that there is a contract. Indeed, this contract was performed: claims were processed and paid, advances were made, quarterly and annual settlements occurred – all pursuant to the contract. The dispute is simply over one of its terms – the ASC Access Fee."

430-431; 172 NW2d 867 (1969), we outlined the general common-law rule that a contract may be enforced despite some terms being incomplete or indefinite so long as the parties intended to be bound by the agreement:

> Even though important terms of the contract were indefinite the trial judge acted properly in supplying the necessary additions. *In an appropriate case an agreement may be enforced as a contract even though incomplete or indefinite in the expression of some term, if it is established that the parties intended to be bound by the agreement, particularly where one or another of the parties has rendered part or full performance. Where the price is indefinite, the purchaser may be required to pay and the seller to accept a reasonable price.* Where the time of performance is indefinite, performance may be required to be rendered within a reasonable time. Each case will turn on its own facts and circumstances. See 1 Corbin on Contracts, § § 95, 96, 99, 102; 5 Williston on Contracts, § 1459; 1 Williston on Contracts (3d ed), § § 36, 36A, 40, 41, 49; Restatement, Contracts, § 5. [Emphasis added.]

In reviewing the contract terms agreed to by the parties, we reach several legal conclusions. First, the parties agreed to all the terms of the ASC and Schedule A, so there is no question that they " 'intended to enter into a binding contract[.]' " *Nichols*, 296 Mich at 159, quoting 1 Williston on Contracts (rev ed), § 37, p 100. This conclusion applies with equal force to the more discrete question of agreement to the access fee. Contrary to plaintiff's argument, the language of the ASC expressly provided for the collection of additional fees beyond the administrative charge and stop-loss coverage. Plaintiff's contractual obligations are listed under article III of the ASC, the final provision of which states: "The Provider Network Fee, contingency, and any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner as authorized pursuant

to 1980 P.A. 350 will be reflected in the hospital claims cost contained in Amounts Billed."[8]

According to this unnumbered provision, the parties agreed that plaintiff would be charged for additional fees beyond the administrative charge and stop-loss coverage, and that those fees would be reflected in the hospital claims cost contained in "Amounts Billed." The term "Amounts Billed" was broadly defined in the ASC as the amount owed in accordance with defendant's "standard operating procedures." Thus, the agreed-upon terms of the ASC allowed for the collection of the access fee, the means for collection, and the process through which it could be determined.

This is also reflected in Schedule A, which has since at least January 2007 reflected the parties' agreement that the access fee covered three specific costs or charges and would be retained by defendant as a part of the overall savings realized by plaintiff:

> 11. A portion of your hospital savings has been retained by BCBSM to cover the ASC Access Fee. The ASC Access Fee covers (a) costs associated with the establishment, management and maintenance of BCBSM's participating hospital, physician and other health provider networks, (b) charges to help maintain BCBSM's surplus at an appropriate level in compliance with regulatory and Blue Cross and Blue Shield Association standards, and (c) cost transfer

---

[8] In a December 21, 1992, ruling, Michigan Insurance Commissioner David J. Dykhouse stated that, with respect to the OTG costs, "it is BCBSM's obligation to pursue the collection of cost transfers from its ASC customers." Final Decision (Case No. 91-11806-BC), p 5. The rationale was that because defendant's ASC customers derive a benefit from defendant's tax-exempt status, it is not unreasonable to expect that the ASC customers would also contribute (just as defendant's other lines of business do) a cost transfer to foster the affordability of health care coverage for Michigan's elderly residents. See *Pipefitters Local 636 Ins Fund v Blue Cross Blue Shield of Mich*, 654 F3d 618, 632 (CA 6, 2011).

subsidies or surcharges authorized pursuant to 1980 P.A. 350, such as the group conversion fee and the 'other than group' subsidy.

Consequently, the parties unequivocally agreed to the payment of the access fee, what it covered, and how it would be paid. This takes us to the ultimate question raised by plaintiff: Does the contract's failure to reference a specific dollar amount for, or allegedly a means for calculating, the access fee make the fee unenforceable? For the reasons expressed below, we answer that question in the negative.

In determining the answer to this question, we first look to the language of the parties' agreement. *Meagher*, 222 Mich App at 721-722. In doing so, we also remain cognizant of what we recognized earlier, which is that our courts do not look favorably on arguments that a contract cannot be enforced because of the indefiniteness of a term. *Nichols*, 296 Mich at 159; see, also, *Waites v Miller*, 244 Mich 267, 272; 221 NW 171 (1928). This sound rule is premised in part on the principle that parties to contracts should not be readily able to evade their obligations using after-the-fact assertions of indefiniteness. See *Dumas v Auto Club Ins Ass'n*, 437 Mich 521, 556; 473 NW2d 652 (1991) (BOYLE, J., concurring). As we consider this issue, we are also keenly aware that the challenged access fee is not the only consideration involved in this contract, but is instead one of several forms of costs and charges agreed to by the parties.[9]

---

[9] It is primarily for this reason that the cases relied on by plaintiff are of no real assistance. In *Dayton v Stone*, 111 Mich 196, 199; 69 NW 515 (1896), for example, the parties entered into a contract for the sale of both damaged and undamaged goods, but had failed to agree on the value or valuation mechanism for the damaged goods, which, given the subject of the contract, was an essential term. Likewise, the parties in *Reed v Vander Zalm*, 336 Mich 1, 9; 57 NW2d 304 (1953), had allegedly

Turning to the contract itself, there is no doubt that the parties entered into a valid and enforceable contract that has been performed by both parties over a significant number of years, a fact plaintiff readily admits. And as part of that contract, the parties agreed that the access fee would be paid out of the savings plaintiff benefited from as a result of defendant's network savings. Although the contract does not have a specific price for the access fee, it is nonetheless binding on the parties because "the promises and performances to be rendered by each party are set forth with reasonable certainty." *Nichols*, 296 Mich at 159. In other words, because there is no dispute that the parties specifically agreed to the access fee, what comprised the access fee, and how it was to be paid, and because the amount was reasonably ascertainable through defendant's standard operating procedures, the contract does not fail for indefiniteness.

It is simply not enough to say that the fee agreed to is not binding because no specific dollar figure was placed in the contract.[10] As reflected above, the answer instead comes from looking at the *entire* agreement and

contracted for the purchase of land and the erection of a building, but the Court held that there had been no meeting of the minds on the cost of the house, the lot, or the insurance and taxes and that there was no provision in the alleged agreement that could be looked to in defining these costs. Finally, in *Zurcher*, 238 Mich App at 294-295, the Court held that the consideration (the price of the house) *was* stated and so was not at issue in the case, while in *Ford Motor Co v Kahne*, 379 F Supp 2d 857, 874-875 (ED Mich, 2005), the court was addressing an alleged contract that had purposely left material terms open to future negotiation, which is not what is presented here.

[10] Though there is no need to rely on decisions from outside our state to decide this issue, we note that this point has been recognized before today. See, e.g., *GEM Advisors, Inc v Corporación Sidenor, SA*, 667 F Supp 2d 308, 326 (SD NY, 2009) ("The failure to fix a sum certain, however, is not necessarily fatal to a contract."), relying on *Cobble Hill Nursing Home v Henry & Warren Corp*, 74 NY2d 475, 483; 548 NYS2d 920; 548 NE2d 203 (1989).

determining its *full* substance in order to enforce the parties' intentions. *Higbie v Chase*, 306 Mich 577, 595-596; 11 NW2d 248 (1943). Plaintiff does not dispute that defendant was able to calculate the access fee amounts through the "Development of Access Fee Factors," which is in conformity with defendant's "standard operating procedures."[11] As defendant argues, the "Development of Access Fee Factors" reflects an objective formula, based on a review of the fees and costs historically charged to plaintiff, for calculating the amount actually comprising the access fee. This manner of determining the contractually agreed amount of the access fee is entirely consistent with the plain language of the contract, as well as Michigan common law. *Waites*, 244 Mich at 272 ("Courts do not favor the destruction of contracts because of indefiniteness, and hold that uncertainty may be removed by subsequent acts, conduct, declarations, or agreements of the parties."); see, also, *Shelton v Wilson*, 274 Mich 433, 436; 264 NW 854 (1936); *Thompson v Tucker-Osborn*, 111 Mich 470, 479-480; 69 NW 730 (1897); 1 Restatement Contracts, 2d, § 34(2), p 97. There is also no dispute that had plaintiff wanted to determine this amount, it had the ability to do so through the contractual annual audit, in which presumably the same "Development of Access Fee Factors" and the results of its formula would have been produced. For these reasons, we hold that the access fee was readily ascertainable through defendant's standard operating procedures, and therefore plaintiff was obligated to pay the fee to which it agreed.[12]

---

[11] Plaintiff's counsel admitted to the trial court at the October 23, 2008, motion hearing that defendant does "have a methodology," but argued that plaintiff did not agree to it.

[12] As a result of this conclusion, we need not address defendant's alternative argument that if there was no readily ascertainable and

## B. FIDUCIARY DUTY

The trial court also held as a matter of law that defendant had a fiduciary duty toward plaintiff and that defendant breached that duty. Whether to recognize a cause of action for breach of fiduciary duty is a question of law reviewed de novo, *Teadt v Lutheran Church Missouri Synod*, 237 Mich App 567, 574; 603 NW2d 816 (1999), because the existence of a duty is generally a question of law, *Meyer & Anna Prentis Family Foundation, Inc v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 43; 698 NW2d 900 (2005).

A fiduciary relationship is

> "[a] relationship in which one person is under a duty to act for the benefit of the other on matters within the scope of the relationship. Fiduciary relationships—such as trustee-beneficiary, guardian-ward, agent-principal, and attorney-client—require the highest duty of care. Fiduciary relationships [usually] arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer." [*In re Karmey Estate*, 468 Mich 68, 74 n 2; 658 NW2d 796 (2003), quoting Black's Law Dictionary (7th ed).]

Even assuming that defendant owed a fiduciary duty to plaintiff, as a result of our holding that defendant was authorized by the contract to charge the access fee, plaintiff cannot maintain its breach-of-fiduciary-duty

agreed-upon fee amount, the result would not be a cause of action for breach of contract, but would instead be that no contract between the parties existed, at least as far as the access fee was concerned.

claim. Plaintiff's complaint specifically alleges that defendant had a duty to "clearly disclose to Plaintiff that it was charging Plaintiff additional fees, the amount of those fees and not to undertake a program of misinformation . . . regarding those fees." Plaintiff then alleged that defendant violated that duty "by . . . charging and . . . receiving a secret fee from plaintiff's account."[13] However, because this alleged breach of duty resulted from defendant's charging a fee that it was contractually entitled to charge, that allegation should also have been dismissed on defendant's motion for summary disposition.

We reverse the trial court's order granting plaintiff summary disposition of its claims for breach of contract and fiduciary duty and remand for entry of an order granting defendant's motion for summary disposition of those claims.

No costs, neither side having prevailed in full on the merits of the case. MCR 7.219(A).

FITZGERALD, P.J., and GLEICHER, J., concurred with MURRAY, J.

---

[13] Plaintiff also alleged that defendant fraudulently concealed the fees, but as noted the jury rejected that position.