# STATE OF MICHIGAN

# COURT OF APPEALS

BANK OF NEW YORK MELLON, f/k/a BANK
OF NEW YORK, as Trustee for the Certificate
Holders of CWABS, INC., ASSET-BACKED
CERTIFICATES SERIES 2003-3,

UNPUBLISHED
December 23, 2014

Plaintiff-Appellant,

v

No. 316521
Wayne Circuit Court
LC No. 11-008424-CH

JAAFAR K. JAAFAR and BADIA JAAFAR,

Defendants-Appellees.

Before: MURRAY, P.J., and SAAD and HOEKSTRA, JJ.

PER CURIAM.

Plaintiff appeals the trial court's order that enforced a settlement agreement between the parties. For the reasons stated below, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

On July 13, 2011, plaintiff Bank of New York Mellon ("BNY") filed a complaint against defendants for judicial foreclosure of real property located in Livonia. At the time of the mortgage default, defendant owed a principal balance of $274,686.33. In October 2011, the parties started to negotiate a settlement. Both parties agree that defendants offered to settle the litigation for $190,000, and then $260,000, but BNY rejected each sum. Thereafter, the parties' attorneys exchanged several e-mail messages. On January 20, 2012, BNY's counsel sent the following e-mail:

> I received correspondence from my client regarding your client's offer. My client has advised me that the offer was reviewed and is still too low. *Would your client be willing to increase the offer by $5K? Please advise me of your client's decision.* [Emphasis added.]

On January 21, 2012, defendants' counsel replied, by e-mail, with a simple "yes." On January 24, 2012, defendants' counsel sent another e-mail to BNY's attorney in which he inquired: "Have you confirmed the 265k my client wants to settle this [sic]." On February 7, 2012, defendants' counsel sent another e-mail, asking: "Any word on our counter offer?" In reply to this e-mail, plaintiff's counsel sent the following message on February 8, 2012:

-1-

I sent you're [sic] confirmation that your client would increase his offer by $5K. At this time I'm still waiting to hear back from my client.

After this e-mail, the parties apparently continued to have "settlement discussions." On September 12, 2012, BNY filed a motion for summary disposition to foreclose on the mortgage. Defendants countered with a motion to enforce a purported settlement agreement between the parties. Relying on the e-mail exchanges, defendants argued that BNY had agreed to settle the case for $265,000. Specifically, defendants stressed that: (1) they originally offered to pay BNY $260,000; (2) BNY made a counteroffer for $265,000; and (3) defendants promptly accepted this counteroffer on January 21, 2012. At the hearing on BNY's motion, defendants' lawyer told the court that they provided several appraisals on the property and proof of funds for the settlement at BNY's request, and BNY did not refute this assertion at the hearing or at any time thereafter.

BNY asserted that a settlement agreement did not exist because neither party had had a meeting of the minds, or provided consideration for the agreement. The trial court rejected BNY's argument, and found that the parties had entered into a binding settlement agreement. It accordingly issued an order in December 2012, which granted defendant's motion to enforce settlement.[1]

On appeal,[2] BNY argues the trial court erred when it found the existence of a settlement agreement. It also asserts that, even assuming an agreement exists, any settlement agreement between it and defendants cannot be valid because the agreement would not comply with the requirements of MCR 2.507(G) and MCL 566.132.

## II. STANDARD OF REVIEW

A settlement agreement is in the nature of a contract. *Kloian v Domino's Pizza LLC,* 273 Mich App 449, 452; 733 NW2d 766 (2006). The existence and interpretation of a contract are questions of law that are reviewed de novo,[3] as are matters of statutory interpretation. *Titan Ins Co v Hyten,* 491 Mich 547, 553; 817 NW2d 562 (2012). However, a trial court's decision to enforce a settlement agreement is reviewed for an abuse of discretion. *Groulx v Carlson,* 176 Mich App 484, 493; 440 NW2d 644 (1989).

---

[1] The trial court subsequently denied plaintiff's motion to vacate the order of December 3, 2012, based on a finding that it was an untimely motion for reconsideration that lacked merit.

[2] Our Court initially denied plaintiff's delayed application for leave to appeal the trial court's order. *Bank of New York Mellon v Jaafar,* unpublished order of the Court of Appeals, entered November 21, 2013 (Docket No. 316521). The Michigan Supreme Court, in lieu of granting leave to appeal, remanded the action to our Court for consideration as on leave granted, and offered no further instruction on the disposition of this case. *Bank of New York Mellon v Jaafar,* 495 Mich 991; 845 NW2d 493 (2014).

[3] *Kloian*, 273 Mich App at 452.

The primary goal of statutory interpretation is to discern and give effect to the intent of the Legislature as expressed in the actual words of the statute. *Pohutski v City of Allen Park,* 465 Mich 675, 683; 641 NW2d 219 (2002). The words of a statute are to be given their plain and ordinary meaning. *Id.* Only where the statutory language is ambiguous should a court look outside the statute to ascertain the Legislature's intent. *Id.*

## III. ANALYSIS

## A. THE EXISTENCE OF A SETTLEMENT AGREEMENT

## 1. BNY'S ASSENT

An agreement to settle a pending lawsuit is in the nature of a contract and is governed by the legal principles applicable to the construction and interpretation of contracts. *Kloian*, 273 Mich App at 452. It is axiomatic that before a contract can be completed there must be an offer and an acceptance. *Id.* at 452-453. An "offer" is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Eerdmans v Maki,* 226 Mich App 360, 364; 573 NW2d 329 (1997). "Acceptance must be unambiguous and in strict conformance with the offer." *Id.*

Here, BNY wrongly says that the trial court erred when it enforced the alleged settlement agreement because BNY did not assent to the settlement agreement. As noted, after defendants offered to pay BNY $260,000 to settle this case, the parties exchanged emails in which BNY's attorney stated that the offer was "still to low" and asked defendants' lawyer if his client would be "willing to increase the offer by $5 K?"—i.e., to $265,000. BNY's counsel added: "Please advise me of your client's decision."

The only possible interpretation of these statements is that BNY presented a counteroffer for settlement of a sum certain ($265,000) and explicitly asked for a "decision" from defendants as to that counteroffer. In response to BNY's e-mail, defense counsel replied: "yes." As such, defendants accepted BNY's counteroffer to settle the case at $265,000. Accordingly, BNY manifested its "willingness to enter into a bargain, so made as to justify [defendants] in understanding that [their] assent to that bargain is invited and will conclude it." *Eerdmans*, 226 Mich App at 364. BNY's claims that it did not assent to the agreement are without merit—it instigated the agreement by making the $265,000 counteroffer, which was unequivocally accepted.

## 2. MEETING OF THE MINDS AND CONSIDERATION

A contract requires mutual assent or a meeting of the minds on all the essential terms,[4] which can be found from performance and acquiescence in that performance. *Sanchez v Eagle Alloy Inc,* 254 Mich App 651, 665-666; 658 NW2d 510 (2003). An objective standard is used to judge whether there was a meeting of the minds, and the court looks "to the express words of the

_____

[4] *Eerdmans*, 226 Mich App at 364.

-3-

parties and their visible acts, not their subjective states of mind." *Calhoun Co v Blue Cross Blue Shield Mich,* 297 Mich App 1, 13; 824 NW2d 202 (2012).

Here, BNY unconvincingly argues that the settlement agreement did not really exist, because the emails that supposedly created the agreement did not involve an explicit contract to dismiss any of BNY's claims or discharge its mortgage as consideration. Because the agreement was made in the context of settlement negotiations, the dismissal of BNY's claims and its discharge of the mortgage were implicit in the offer and acceptance of the agreement—they were the objects of the parties' agreement to settle a lawsuit that explicitly involved BNY's claims (as the plaintiff), and its mortgage on the property.

BNY's conduct after the email exchange also belies its argument that a settlement agreement did not exist. At trial, defendants' lawyer noted that defendants complied with BNY's request to have the property appraised and show proof of funds for the settlement. If an agreement did not exist, BNY would not have asked defendants to engage in either of these activities. And, tellingly, BNY did not deny that the parties engaged in these activities, which demonstrate that a settlement had been reached.

## B. MCR 2.507(G) AND MCL 566.132

### 1. MCR 2.507(G)

"A contract for the settlement of pending litigation that fulfills the requirements of contract principles will not be enforced unless the agreement also satisfies the requirements of [MCR 2.507(G)]." *Kloian,* 273 Mich App at 456. MCR 2.507(G) provides that an agreement between litigants "is not binding unless it was made in open court, or *unless evidence of the agreement is in writing, subscribed by the party against whom the agreement is offered or by that party's attorney.*" (Emphasis added.)

Here, BNY says that the settlement agreement between the parties did not satisfy the writing requirements of MCR 2.507(G),[5] because BNY did not "subscribe" to any e-mail message evidencing the essential elements of a settlement agreement between the parties. This is simply a reiteration of BNY's argument that the settlement agreement does not exist. It does not demonstrate that the agreement did not satisfy the mandates of MCR 2.507(G).

Again, MCR 2.507(G) requires that "evidence" of the agreement be in writing, and subscribed by the party against whom the agreement is offered—here, BNY. As noted, BNY's

---

[5] The language of this court rule originally appeared in MCR 2.507(H). At the time this case was decided, the language appeared in MCR 2.507(G). When MCR 2.507(G) was amended in October 2014, former subsection (G) was moved to subsection (F), but the text of the rule was not changed. All references to this rule in this opinion refer to MCR 2.507(G).

The parties do not dispute that an e-mail can satisfy the writing requirement of MCR 2.507(G). Similarly, the parties do not seriously dispute that the act of typing one's name at the end of an e-mail constitutes "subscribing" to its content. See *Kloian,* 273 Mich App at 458-459.

-4-

attorney's email, which rejected defendants' offer to settle at \$260,000 and suggests \$265,000 as a counteroffer, constituted "evidence" of the settlement agreement under MCR 2.507(G). BNY's attorney's email is also electronically signed at the bottom by the attorney, and thus satisfies MCR 2.507(G)'s mandate that the "writing" evidencing the agreement be "subscribed" to by BNY or its attorney.[6]

Accordingly, the parties entered into a valid settlement agreement via an email exchange, and the settlement agreement complied with the requirements of MCR 2.507(G).

## 2. MCL 566.132

MCL 566.132, which codifies the statute of frauds, provides in relevant part:

(2) *An action shall not be brought against* a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:

(a) A promise or commitment to lend money, grant or extend credit, *or make any other financial accommodation*.

(b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.

(c) A promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation. [Emphasis added.]

Accordingly, by its plain language, MCL 566.132(2) prohibits a plaintiff from bringing an action "against a financial institution" in the scenarios enumerated in subsections (a) through (c). The Legislature adopted MCL 566.132(2) in part to protect:

---

[6] We note the *Kloian* involved a similar argument over email exchanges and MCR 2.507(G), and our interpretation of the rule follows *Kloian*'s approach:

The original settlement agreement, embodied in the March 18, 2005 e-mail *messages,* satisfies the subscription requirement of MCR [2.507(G)]. The March 18, 2005, e-mail containing the terms of the settlement offer was subscribed by plaintiff's attorney because he typed or appended his name at the end of the e-mail message. Likewise, the March 18, 2005, e-mail from defendant's attorney containing the acceptance of the offer was subscribed because it, too, contained defendant's attorney's name at the end of the e-mail message. [*Kloian*, 273 Mich App at 459 (emphasis added).]

-5-

financial institutions from potentially fraudulent or spurious claims by disgruntled borrowers. See 1992 PA 245. To that end, the Legislature provided that no one may bring an "action" against "a financial institution" if the action seeks to "enforce" a promise or commitment by the financial institution "unless the promise or commitment is in writing and signed with an authorized signature by the financial institution." MCL 566.132(2). [*Huntington Nat'l Bank v Daniel J Aronoff Living Trust,* 305 Mich App 496, 509; 853 NW2d 481 (2014).]

In this case, BNY incorrectly contends that the settlement agreement did not comply with MCL 566.132(2) and is thus unenforceable. The plain language of MLC 566.132(2) states that it does not apply to this lawsuit. Here, BNY—the financial institution—is the plaintiff, and launched the action. Defendants did not bring any action against BNY, and thus that MCL 566.132(2) is inapplicable. Nor is defendant a "disgruntled borrower" bringing a "potentially fraudulent or spurious claim" against BNY—BNY brought suit, and defendants are attempting to settle the suit—by providing BNY with close to the full amount of money that they owe on the mortgage.[7]

Were we nonetheless to accept that MCL 566.132(2) is applicable to this suit, the types of promises the statute lists as unenforceable absent a writing do not encompass the type of promise defendants seek to enforce. Again, defendants do not seek to enforce a promise to: (1) "lend money, grant or extend credit or make any other financial accommodation"[8]; (2) "renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation"; or (3) "waive a provision of a loan, extension of credit, or other financial accommodation." MCL 566.132 is therefore inapplicable to this lawsuit and BNY's arguments to the contrary are without merit.

---

[7] Again, at the time of the default, the outstanding principal balance on the mortgage was $274,686.33. The settlement agreement provides BNY with $265,000.

[8] BNY argues that the settlement agreement constitutes a "financial accommodation," but this argument is unconvincing. Noting that MCL 566.132 does not define "financial accommodation," our Court has held that "financial accommodation" can encompass an agreement to delay a foreclosure sale and an agreement to temporarily refrain from seizing collateral. *Barclae v Zarb,* 300 Mich App 455, 469-470; 834 NW2d 100 (2013). We do not think that a settlement agreement is similar to either of these arrangements. A contract to delay a foreclosure sale or temporarily refrain from seizing collateral usually benefits only one party— the debtor. By contrast, a settlement agreement, which by definition is a compromise of a disputed claim, always provides benefit to both the creditor and debtor. Accordingly, the term "financial accommodation" as used in MCL 566.132(2) does not encompass the settlement agreement at issue in this case.

Affirmed.

/s/ Henry William Saad
/s/ Joel P. Hoekstra