# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

ASKER ASMI, M.D. and PULMONARY SLEEP
MEDICINE, PC,

        Plaintiffs/Counter Defendants-
        Appellants,

v

IQBAL NASIR, M.D. and DOWNRIVER
SPECIALISTS, PC,

        Defendants/Counter Plaintiffs-
        Appellees,

and

DOWNRIVER SLEEP DISORDERS, PC,

        Defendant-Appellee.

UNPUBLISHED
November 4, 2014

No.   316208
Wayne Circuit Court
LC No.   11-006759-CK

---

ASKER ASMI, M.D. and PULMONARY SLEEP
MEDICINE, PC,

        Plaintiffs/Counter Defendants-
        Appellees,

v

IQBAL NASIR, M.D. and DOWNRIVER
SPECIALISTS, PC,

        Defendants/Counter Plaintiffs-
        Appellants,

and

DOWNRIVER SLEEP DISORDERS, PC,

        Defendant-Appellant.

No.   316233
Wayne Circuit Court
LC No.   11-006759-CK

---

-1-

DOWNRIVER SPECIALISTS, PC,

       Plaintiff/Counter
       Defendant/Appellant/Cross-
       Appellee,

v                                                                      No.  316234
                                                                       Wayne Circuit Court
SYED M. TALIB RAZA,                                                    LC No.  11-010077-CK

       Defendant/Counter
       Plaintiff/Appellee/Cross-Appellant.

---

DOWNRIVER SPECIALISTS, PC,

       Plaintiff/Counter Defendant-
       Appellant,

v                                                                      No.  317002
                                                                       Wayne Circuit Court
SYED M. TALIB RAZA, MD,                                                LC No.  11-010077-CK

       Defendant/Counter Plaintiff-
       Appellee.

---

Before:  CAVANAGH, P.J., and JANSEN and RONAYNE KRAUSE, JJ.

PER CURIAM.

The instant appeal involves two consolidated cases and four discrete appeals. It arises out of a complex employment relationship involving three doctors and their respective professional corporations. Each party appeals from trial court orders dismissing their claims or counterclaims under MCR 2.116(C)(10). In addition, Dr. Nasir and Downriver appeal the trial court's award of case evaluation sanctions to Dr. Raza, and they conditionally appeal the trial court's decision to consolidate the two cases. We affirm in part, reverse in part, and remand for further proceedings.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Iqbal A. Nasir, M.D., is an internist and owner of Downriver Specialists, P.C., and Downriver Sleep Disorders, P.C.[1] Asker Asmi, M.D., a pulmonologist who also practices critical care medicine and sleep medicine, worked for Critical Care Medicine Partners, P.C. (CCP) in a hospital-based practice but wished to expand his pulmonology practice. In 2007, Dr. Asmi and Dr. Nasir worked out an arrangement under which Dr. Asmi would treat patients at Downriver one half-day per week and Dr. Nasir would handle the billing for Dr. Asmi's office patients while CCP continued to handle the billing for his hospital patients. When Dr. Asmi left CCP in 2008, the agreement expanded such that Dr. Nasir handled all of Dr. Asmi's billing. Dr. Asmi testified at his deposition that he expected Dr. Nasir to remit to him the revenue he generated minus the "going rate" of 4%-5% for billing costs, the professional and legal expenses Dr. Nasir paid on his behalf, and a proportionate charge for his use of Downriver's facilities one half-day per week. Dr. Nasir testified at his deposition that he told Dr. Asmi they would split the revenue differently, with Dr. Nasir receiving 55% and Dr. Asmi 45%. Dr. Nasir justified this split on the grounds the he helped build Dr. Asmi's practice by asking physicians at the hospital where he was Chief of Staff if they could refer patients to Dr. Asmi. Dr. Asmi disputes this account of how his practice increased.

Dr. Nasir testified that there was no agreement regarding how frequently he would pay Dr. Asmi and that he never provided Dr. Asmi with an audit, accounting, or written document substantiating or explaining the amount he was being paid. Dr. Nasir acknowledged that the checks he wrote to Dr. Asmi were not necessarily 45% of the revenue collected because Dr. Asmi frequently requested specific amounts of money and Dr. Nasir intended to balance things out later. Dr. Asmi received at least 65% of the revenue he generated each year from 2007 through 2009, but in 2010, when the relationship began to unravel, he received only 23%. Over the course of their business relationship, Dr. Asmi generated $1,896,319.82. Dr. Nasir deducted $103,674 for Dr. Asmi's various professional and legal expenses, remitted $1,009,100 to Dr. Asmi, and retained approximately $783,226. Consequently, Dr. Asmi received in total slightly more than 53% of his generated revenue.

In 2009, Downriver hired Syed M. Talib Raza, M.D., who practices critical care medicine, pulmonary medicine, and sleep medicine. Dr. Nasir intended for Dr. Raza to work with Dr. Asmi. Dr. Raza's employment contract stipulated that he would be paid $180,000 per year, with the potential for an annual bonus. Downriver would provide malpractice insurance, family health insurance "of the type and nature provided for other employees of [Downriver]," paid vacation, and "up to one week paid leave for attendance at conferences or medical meetings. The contract contained an exclusivity provision, which required Dr. Raza to "devote his entire time, attention, and energies to his employment" with Downriver, and an accounting provision, which required him to turn over all income generated "in the practice of medicine and all activity directly related thereto" to Downriver. It also contained a noncompetition clause requiring him to refrain from practicing medicine within a ten-mile radius of Downriver for two years after termination of his employment with Downriver.

---

[1] Although named as a defendant, Downriver Sleep Disorders, P.C., is not an existing entity and had no involvement with the issue in dispute.

Dr. Raza asked Dr. Nasir to delete the provision in the contract leaving reimbursement of conference expenses to the "sole discretion" of Downriver, but Dr. Nasir declined to do so. Dr. Raza said in his deposition testimony that Dr. Nasir agreed to pay him an extra $500 per month as a mileage allowance, and to allow him to keep the money he earned working as a supervising physician at, and interpreting sleep studies for, SleepMed sleep laboratory in Southfield, Michigan. Dr. Raza asked Dr. Nasir to amend the contract to show that he could keep the income from SleepMed, but Dr. Nasir declined, saying he could change the numbers in the contract, but it was too expensive to change the words.

It turned out that Downriver employees did not receive a health insurance benefit. Dr. Nasir put Dr. Raza in touch with an insurance agent who could help him arrange for an individual policy for himself and his family. According to Dr. Raza, Dr. Nasir told him he would reimburse the premiums. Dr. Nasir did reimburse some, but not all, of Dr. Raza's healthcare expenses. Dr. Nasir did not reimburse Dr. Raza's conference expenses, nor did he pay Dr. Raza a mileage allowance.

The business relationship between Dr. Nasir and Drs. Asmi and Raza began to fail in 2010. In March 2010, Dr. Asmi submitted several months of billing sheets to Downriver for processing. According to Dr. Asmi, Downriver did not accept the billing sheets and they sat in the office for two months before Dr. Asmi took them back. According to Dr. Nasir/Downriver, the sheets were unorganized and missing essential information, and Dr. Asmi agreed to organize them, but did not and stopped submitting his hospital billing sheets to Downriver for processing. In the late summer or early fall, Dr. Asmi began looking for an office building in which to open his own clinic. According to a Downriver employee, Dr. Asmi and Dr. Raza discussed practicing together, and Dr. Asmi asked Dr. Raza if his contract with Downriver would be a problem. At about the same time, Drs. Asmi and Raza discovered that Dr. Nasir might have used their names without their consent to bill insurers for sleep studies in which they had not been involved. Dr. Raza tendered his resignation to Dr. Nasir early in December 2010 and left Downriver in March 2011. Dr. Asmi left in January or February 2011. They opened a clinic just over six miles from Downriver and began treating patients there in the summer of 2011.

Dr. Asmi and his P.C. filed a complaint against Dr. Nasir and his corporations for breach of contract and unjust enrichment,[2] and Downriver filed suit against Dr. Raza for breach of contract. Dr. Nasir and Downriver filed a counter claim against Dr. Asmi and his corporation for breach of contract, tortious interference with Dr. Raza's contractual obligations, conversion of the billing sheets that Dr. Asmi took away from Downriver, and unjust enrichment. Dr. Raza filed a counter claim against Downriver for breach of contract, unjust enrichment, invasion of privacy, and two counts of misrepresentation. At an off-the-record status conference, the court consolidated all of the above claims into the instant action. The parties filed various motions and cross-motions for summary disposition. The trial court initially granted summary disposition to

---

[2] He later amended his complaint to include a claim of conversion, but that claim was dismissed and Dr. Asmi does not appeal that dismissal.

Dr. Raza, and it subsequently dismissed all remaining claims, all pursuant to MCR 2.116(C)(10). The trial court awarded Dr. Raza case evaluation sanctions against Downriver.

## II.  STANDARD OF REVIEW

We review a trial court's decision on a motion for summary disposition de novo. *Auto Club Group Ins Co v Burchell*, 249 Mich App 468, 479; 642 NW2d 406 (2002).  A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Smith v Globe Life Ins Co*, 460 Mich 446, 454; 597 NW2d 28 (1999).  "[T]he moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996) (citation omitted).  The trial court views the evidence in the light most favorable to the party opposing the motion. *Id*.  If the moving party meets its initial burden, the burden shifts "to the opposing party to establish that a genuine issue of disputed fact exists." *Id*.  "Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists." *Id*. (citation omitted).  If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, and the moving party is entitled to judgment as a matter of law, the trial court may grant the motion. *Id*. at 363 (citation omitted).

## III.  ASMI V NASIR

### III.A.  BREACH OF CONTRACT

Both parties insist they had an express oral agreement that the other party breached and that the trial court erred in dismissing their respective breach of contract claim and counterclaim. The trial court did not address the issue of whether the parties' agreement constituted a valid and binding contract.  After reviewing the record, we find that neither party presented evidence establishing a meeting of the minds regarding the essential term of revenue distribution.  We also find that neither party established that they would be able to support their factual assertions regarding their alleged agreement or lack thereof at trial.  Therefore, we conclude that the parties did not have a valid and binding contract and the trial court properly declined to impose one.

The essential elements of a contract are parties competent to contract, a proper subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation." *McInerney v Detroit Trust Co*, 279 Mich 42, 46; 271 NW 545 (1937).  The dispositive issue here is mutuality of agreement.  Mutuality of agreement means that there is a meeting of the minds on all essential terms. *Kamalnath v Mercy Memorial Hosp Corp*, 194 Mich App 543, 548; 487 NW2d 499 (1992).  A meeting of the minds is "judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Id*.

Dr. Asmi testified that he thought Dr. Nasir/Downriver would process his billing, deduct "the going rate" for billing, as well as an amount for specific professional expenses, and remit the remainder of the revenue to Dr. Asmi; but he admitted that he did not discuss with Dr. Nasir the financial details of their arrangement.  Dr. Nasir's contention that the parties did agree to a 55%/45% revenue splitting formula is incompatible with his actual actions throughout most of

-5-

the relationship. Dr. Asmi received at least 65% of the cash collected each year from 2007 through 2009, while in 2010, the year the relationship broke down, he received only 23%. Dr. Nasir admitted that the checks he wrote to Dr. Asmi did not necessarily amount to 45% of the revenue collected, but he attributed this to his willingness to accommodate Dr. Asmi's frequent requests for specific amounts of money and to his own plan of balancing things out later. Both parties have unambiguously demonstrated that they would be unable to prove at trial that they had an objectively manifested meeting of the minds regarding revenue splitting that comports with their allegations in the matter. Because neither the words nor the actions of the parties establish that they mutually assented to the essential term of how revenue would be divided, they did not form a valid and binding contract. *Kalmanath*, 194 Mich App at 548.[3] Consequently, the trial court properly granted summary disposition against *both* of their contractual claims and, in effect, left the parties as they found themselves.

### III.B.  UNJUST ENRICHMENT

The trial court did not address Dr. Asmi's claim of unjust enrichment. Whether a claim for unjust enrichment can be maintained is a question of law that we review de novo. *Karaus v Bank of New York Mellon*, 300 Mich App 9, 22; 831 NW2d 897 (2010). A claim of unjust enrichment requires a plaintiff to establish (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. *Belle Isle Grill Corp v City of Detroit*, 256 Mich App 463, 478; 666 NW2d 271 (2003). Once this is established, "the law will imply a contract in order to prevent unjust enrichment. However, a contract will be implied only if there is no express contract covering the same subject matter." *Id*. "[I]f reasonable minds could differ" regarding whether the alleged retention of the benefit is unjust, then dismissal is inappropriate. *Kammer Asphalt Paving Co.*, *Inc. v. East China Tp. Schools*, 443 Mich 176, 186, 504 NW2d 635, 640 (1993).

Dr. Asmi's unjust enrichment claim is not precluded by the existence of a contract between the parties because, as discussed, whatever agreement the parties might have had did not cover the relevant financial details. Dr. Nasir argues that Dr. Asmi's claim fails nevertheless because he has not established that it was inequitable for Dr. Nasir to retain $783,266, approximately 40% of Dr. Asmi's billing revenue. While technically accurate, this argument ignores Dr. Asmi's contention that a typical billing arrangement would entail retention of at most

---

[3] Dr. Asmi correctly notes that public policy in Michigan disfavors "judicial avoidance of contractual obligations because of indefiniteness." *Calhoun Co v Blue Cross Blue Shield Michigan*, 297 Mich App 1, 14; 824 NW2d 202 (2012). However, "[l]itigants cannot expect the courts to rewrite their poorly drawn agreements, nor will we attempt to guess at meanings not definitely expressed." *Saginaw Lumber Co v Wilkinson*, 266 Mich 661, 664; 254 NW 240 (1934). To avoid a contract failing for indefiniteness, the essential terms of the contract must be expressed by the parties with reasonable certainty before the law will flesh out any missing details. *Nichols v Seaks*, 296 Mich 154, 159; 295 NW 596 (1941). Not only did the parties in the instant case fail to agree on the essential term of revenue distribution, their respective positions differ substantially. Therefore, failure of the contract for indefiniteness is unavoidable.

10%, in this case, approximately $189,632. Dr. Nasir's testimony touches on other services he allegedly performed for Dr. Asmi, such as obtaining referrals, but Dr. Asmi's testimony stresses his contention that he obtained referrals through his own hard work.

Because the trial court did not address Dr. Asmi's unjust enrichment claim, the trial court never made any findings of fact upon which to base its decision regarding the propriety of equitable relief. See *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008). We will generally uphold a trial court's ruling if it is correct, irrespective of any flawed reasoning employed by the trial court. *Spohn v Van Dyke Pub Schools*, 296 Mich App 470, 479; 822 NW2d 239 (2012). However, in the instant matter, we believe that reasonable minds could differ regarding whether it was equitable for Dr. Nasir to retain 40% of Dr. Asmi's billing proceeds for billing costs and office rental, at least on the bare record we have available to us at this stage of the proceedings. See *Kammer Asphalt Paving*, 443 Mich at 186. We conclude that the trial court erred by dismissing Dr. Asmi's unjust enrichment claim without making relevant factual findings, and reverse the court's grant of summary disposition to Dr. Nasir on this issue.[4]

### III.C. TORTIOUS INTERFERENCE WITH DR. RAZA'S CONTRACT

Dr. Nasir/Downriver allege that the trial court erroneously dismissed the claim against Dr. Asmi for tortious interference with Dr. Raza's contract with Downriver by soliciting Dr. Raza to join him in creating a new practice less than 10 miles from Downriver in violation of the contract's noncompetition clause. In order for Dr. Asmi to be liable for tortious interference with Dr. Raza's contract, Dr. Raza must have breached the noncompete provision in his employment agreement. *Health Call of Detroit v Atrium Home & Health Care Services*, *Inc*, 268 Mich App 83, 89-90; 706 NW2d 843 (2005) (stating the elements of tortious interference as an existing contract, a breach of the contract, and unjust instigation of the breach by the defendant). However, we conclude below that Dr. Raza did not breach the noncompete provision because it was unenforceable as a matter of law. Therefore, Dr. Nasir's tortious interference claim necessarily fails because an essential element cannot be established.

### IV. NASIR/DOWNRIVER V RAZA

### IV.A. NONCOMPETITION CLAUSE

The noncompetition clause in Dr. Raza's contract prohibited him from practicing medicine within 10 miles of Downriver for two years after his employment with Downriver had terminated. Neither the reasonableness of the provision in the abstract nor the fact that Dr. Raza violated it are in dispute. At issue is whether Downriver has a "reasonable competitive business interest," and whether the clause protects that interest. Downriver argues that the trial court erred in determining that it did not have a "reasonable competitive business interest," and in dismissing its claim against Dr. Raza for breach of the noncompete. We disagree.

---

[4] We express no opinion whatsoever whether or not that retention actually *was* equitable, and no such opinion should be inferred.

Contractual covenants against competition, or noncompete clauses, are governed by MCL 445.774a(1), which provides as follows:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

The critical elements are that the covenant must be reasonable and the covenant must protect a "reasonable competitive business interest." Downriver/Dr. Nasir argues that it has a reasonable competitive business interest in retaining the goodwill of referring physicians. Pulmonary medicine and critical care medicine are hospital-based, which means that specialists in these areas, such as Drs. Asmi and Raza, acquire patients by referrals from primary care physicians. Downriver's position is that, because Dr. Nasir increased his business by asking primary care physicians at the hospital where he was Chief of Staff to refer patients to Dr. Raza, Dr. Raza's departure makes it necessary for Dr. Nasir to ask these same primary care physicians to refer their patients to his new pulmonologist.

Downriver's argument simply has no relevance to whatever work Dr. Raza might or might not perform after leaving Downriver. It appears from Downriver's argument that if Dr. Raza had left Downriver's employment for any reason, or had simply ceased working in the medical field altogether, Dr. Nasir would have been required to ask primary care physicians to refer their patients to his new pulmonologist *in any event*. To be enforceable, "a restrictive covenant must protect an employer's reasonable competitive business interests." *Coates v Bastian Bros*, *Inc*, 276 Mich App 498, 506; 741 NW2d 539, 545 (2007). Because the restrictive covenant in Dr. Raza's employment agreement does not protect the reasonable competitive business interest alleged by Downriver, it is unenforceable as a matter of law. *St Clair Med*, *PC v Borgiel*, 270 Mich App 260, 266; 715 NW2d 914, 918 (2006).


## IV.B.  EXCLUSIVITY AND ACCOUNTING PROVISIONS

Downriver also argues that Dr. Raza breached his employment contract by failing to submit to Downriver money he earned practicing medicine at two sleep clinics while also employed by Downriver. We agree.

Dr. Raza's employment contract contained an exclusivity provision that called for him to devote his "entire time, attention and energies" to his employment with Downriver, and prohibited him from engaging in "other business or professional activities" except for teaching, lecturing, writing, or "consulting in matters relating to the practice of medicine." In addition, the contract contained an accounting provision that required Dr. Raza to remit to Downriver any income Dr. Raza generated "in the practice of medicine and all activity directly related thereto,"

except for fees obtained "from lecturing, teaching, writing, or performing other outside work in said field." It is undisputed that Dr. Raza was paid for his work at two sleep centers while employed by Downriver. Dr. Raza argues that his sleep center work was essentially "consulting in matters relating to the practice of medicine," so the income he received falls under the exception for income earned "performing other outside work."

The employment agreement does not define "other outside work." If parsed literally, it could mean absolutely anything Dr. Raza might do outside of Downriver, which would render large portions of the remainder of the agreement nugatory. However, every word in a contract should be given effect if possible, if necessary by considering them in light of the contract as a whole. *Trader v Comerica Bank*, 293 Mich App 210, 216; 809 NW2d 429 (2011). Considering "other outside work" in light of the exclusivity clause, the phrase can be harmonized as a reference either to something that is not "business or professional activity" or to teaching, lecturing, writing, or consulting. Neither party disputes that Dr. Raza's work at the sleep centers was professional activity, and Dr. Raza does not contend that it was teaching, writing, or lecturing. Consequently, "other outside work" must refer to "consulting."

"Consulting" is also not defined in the employment contract. According to *Random House Webster's College Dictionary* (2001 ed), to "consult" means in relevant part "to give professional or expert advice." In contrast, "practice of medicine" is defined by statute as "the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts." MCL 333.17001(1)(f). Although there is some overlap between the two regarding the rendering of advice, the critical distinction between "consulting" and "practicing" clearly pertains to its intended purpose. Specifically, "advice" in the context of "practicing" is for the relatively narrow purpose of diagnosing, treating, preventing, curing, or relieving some sort of medical issue.

When applying the definitions of "consulting" and "practicing" to Dr. Raza's activities at the sleep centers, it is clear that Dr. Raza was in fact practicing medicine and, as both he and his counsel stated, he was performing diagnostic work. The diagnostic work Dr. Raza performed at the sleep centers constituted the practice of medicine and not the kind of "consulting" that would fall into the exclusions of his employment agreement's exclusivity provision. Consequently, any money Dr. Raza received from his sleep medicine work he was required to turn over to Downriver. This is clearly how Dr. Raza understood the provisions, and why he wanted Dr. Nasir to memorialize his agreement to let Dr. Raza keep the money he earned at the sleep centers. Therefore, the trial court erred by dismissing Downriver's claim against Dr. Raza for breach of the exclusivity and accounting provisions in his contract. Consequently, we partially reverse the trial court's order granting summary disposition to Dr. Raza on all of Downriver's claims, and remand the case to the trial court for an entry of judgment for Downriver.

IV.C. FAILURE TO PROVIDE BENEFITS AND COMPENSATION

Dr. Raza argues that the trial court improperly dismissed his counterclaims against Dr. Nasir for breach of the employment contract, fraudulent misrepresentation, and misappropriation of identity. Dr. Raza argues that Dr. Nasir induced him to sign the employment contract with

promises related to health insurance, reimbursement for conference and travel expenses, a mileage allowance, and construction of a new sleep lab, and then breached the contract by failing to fulfill his promises. We disagree.

"Questions involving the proper interpretation of a contract or the legal effect of a contractual clause are also reviewed de novo." *McDonald*, 480 Mich at 197. "Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." *Schmude Oil Co v Omar Operating Co*, 184 Mich App 574, 580, 458 NW2d 659 (1990). Additionally, with certain exceptions not relevant to the instant appeal, "parol evidence is not admissible to show that a written agreement is not integrated when the agreement itself includes an integration clause." *UAW-GM Human Res Ctr v KSL Recreation Corp*, 228 Mich App 486, 495; 579 NW2d 411 (1998).

There is no dispute that the employment contract contains a merger, or integration, clause, which specifies that the contract "represents the entire agreement between the parties hereto, and incorporates and supersedes all other agreements or understandings relating to the subject matter hereof previously entered into or made between the parties hereto and all such arrangements or agreements are hereby terminated."[5] Parol evidence may be admissible to explain ambiguity, but the only even arguable ambiguity in the contract is not one on which Dr. Raza relies.[6] The contract plainly and unambiguously provides that Downriver would provide Dr. Raza "with health insurance of the type and nature provided for other employees" of Downriver. That provision is not facially ambiguous, and while Dr. Raza may have subjectively expected that Downriver would provide some health insurance, the fact that it did not does not make the provision ambiguous in its execution. Likewise, there is nothing ambiguous about a provision making conference reimbursement discretionary with Downriver. It is agreed that there is no provision regarding mileage reimbursement, and Dr. Raza's argument that mileage is somehow a distinct subject matter from the rest of the agreement is unavailing, thus precluding

---

[5] Dr. Raza attempts to distinguish "representations" from any matters covered by the merger clause, in reliance on an unpublished opinion of this Court. *Stout v Withrow*, unpublished opinion per curiam of the Court of Appeals, issued February 14, 2008 (Docket No. 271632). In *Stout*, this Court did hold that a merger clause that purported to cover prior agreements but not prior representations did not preclude reliance on prior representations. *Id.*, slip op at p 9. Even if *Stout* were binding, which it is not, the gravamen of Dr. Raza's claim is that Downriver made prior *promises* to which Dr. Raza agreed as conditions of employment. Regardless of whether Dr. Raza wishes to call them "promises" or "representations," his claim is truly that he and Downriver had prior agreements that were not included in the plain language of the written contract.

[6] Specifically, the handwritten dollar amount of $5,000 next to the contract's paragraph regarding attendance at conferences is unexplained without recourse to extrinsic knowledge that it represented the maximum amount of compensation Downriver might provide, but the parties do not dispute that.

Dr. Raza's unjust enrichment claim. See *Belle Isle Grill Corp*, 256 Mich App at 478 (stating that no contract will be implied if an express contract covering the same subject matter exists).

Regarding reimbursement for conference expenses, Dr. Raza correctly points out that "[w]here a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." *Burkhardt v City Nat Bank of Detroit*, 57 Mich App 649, 652; 226 NW2d 678 (1975). However, the only evidence Dr. Raza has of bad faith is dependent on parol evidence that Dr. Nasir allegedly promised to reimburse up to $5,000 of Dr. Raza's conference and travel expenses. We note that "up to" a particular amount, a well-known and long-established staple of advertising puffery, logically and necessarily includes nothing at all. The fact that Downriver did not reimburse for any of the three conferences Dr. Raza attended, one of which he registered for before the date of the agreement and one of which he registered for after he tendered his resignation, does not inherently constitute *per se* evidence of bad faith.

The parol evidence rule does not preclude the admission of parol evidence to demonstrate fraud. *Baclae v Zarb*, 300 Mich App 455, 480; 834 NW2d 100 (2013). Furthermore, "[f]raud in the procurement of the contract" may entitle the innocent party to money damages in an action at law or reformation of a contract. *Titan Ins Co v Hyten*, 491 Mich 547, 557-558; 817 NW2d 562 (2012). However, actions based on fraud require statements relating to facts in the past or present; "[f]uture promises are contractual and do not constitute fraud." *Hi-Way Motor Co v International Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976). All of the alleged fraud here pertains to the future as statements that Downriver *would* provide health insurance and reimbursement as part of Dr. Raza's employment compensation. There is a "bad faith" exception to the limitation to past or existing facts if a promise is made with the present intent not to keep it. *Crowley v Langdon*, 127 Mich 51, 58-59; 86 NW 391 (1901). However, although Dr. Raza asserts that the record shows that Dr. Nasir or Downriver never intended to provide him with the allegedly-promised insurance or reimbursement, we are not persuaded that such evidence has been established. Consequently, we conclude that the trial court properly dismissed Dr. Raza's counterclaims against Downriver pertaining to Downriver's alleged broken employment compensation promises.

## IV.D. MISAPPROPRIATION OF IDENTITY

Dr. Raza also argues that the Downriver/Dr. Nasir misused his name on Medicare billings. Dr. Raza asserts two theories justifying equitable relief regarding Downriver's alleged use of his name on Medicare billings. The first is fraudulent misrepresentation. In relevant part, such a claim requires the defendant to have made a misrepresentation with the intent that the plaintiff act on it, and the plaintiff must in fact act on it. *Hi-Way Motor Co*, 398 Mich at 336; see also *Kimble v Gillard*, 177 Mich 250, 256; 143 NW2d 79 (1913). The alleged misrepresentation is the use of Raza's name in submissions to another entity entirely. Presuming Downriver did in fact dishonestly put Dr. Raza's name on Medicare billings, it is obvious that Dr. Raza was not intended to act thereon. Consequently, the trial court correctly dismissed Dr. Raza's fraudulent misrepresentation claim regarding the use of his name on Medicare billings.

However, Dr. Raza's claim for invasion of privacy has merit, at least to the extent it is a recognized claim in Michigan. Our Supreme Court has observed that "[t]he common-law right

of privacy" protects, *inter alia*, "[p]ublicity which places the plaintiff in a false light in the public eye" and "[a]ppropriation, for the defendant's advantage, of the plaintiff's name or likeness." *Tobin v Michigan Civil Service Comm*, 416 Mich 661, 672; 331 NW2d 184 (1982). The latter is known as the "right of publicity," which "protects an individual's pecuniary interest in the commercial exploitation of his or her identity." *Hauf v Life Extension Foundation*, 547 F Supp 2d 771, 778 (WD Mich, 2008). Michigan recognizes the "right of publicity" to the extent it does not implicate matters of public concern, and holds that "any unauthorized use of a plaintiff's name or likeness, however inoffensive in itself, is actionable if that use results in a benefit to another." *Battaglieri v Mackinac Center for Public Policy*, 261 Mich App 296, 300-302; 680 NW2d 915 (2004). Consequently, although the right protects the "pecuniary interest in the commercial exploitation" of the plaintiff's identity, it appears that a defendant does not need to make "commercial" use thereof, but rather merely some use from which the defendant receives some kind of benefit.

Presuming Downriver did in fact falsely use Dr. Raza's name on Medicare billings, Downriver did so for the purpose of deriving a pecuniary benefit; namely, payment for medical services rendered. Dr. Raza's income is derived from being a doctor, so he clearly has a commercial interest in his professional identity. Furthermore, Dr. Raza makes a reasonable point that "the public" may consist of the medical community, and using his name in connection with matters he was not involved in could place him in a false light in the public eye. Downriver argues that Dr. Raza cannot prove this claim because the statutory physician-patient privilege, MCL 600.2157, bars any use of the alleged medical or billing records. *Meier v Awaad*, 299 Mich App 655, 678; 832 NW2d 251 (2013). Dr. Raza notes that he can introduce testimony that he personally saw the documents and can introduce at least some billing records without violating the physician-patient privilege. This Court is not in a suitable position to resolve this evidentiary debate at this stage of the proceedings. Because we believe that Dr. Raza's "misappropriation of identity" claim has arguable merit and at least a reasonable possibility of being provable at trial, we conclude that the trial court erred by dismissing it, and partially reverse the trial court's order granting Downriver summary disposition on all its claims against Dr. Raza.

## V. CONSOLIDATION AND CASE EVALUATION SANCTIONS

Dr. Nasir and Downriver argue that if any of the claims in the *Asmi v Nasir* action and the *Downriver v Raza* action are remanded for trial, the trial court's order consolidating these actions for trial should be reversed and the cases separated because they share no substantial and controlling question of law and fact. In essence, Downriver contends that the trial court erred in consolidating the cases. We disagree.

For purposes of convenience and judicial economy, a trial court may consolidate actions if they involve "a substantial and controlling common question of law or fact," and consolidation does not significantly prejudice a party's substantial rights. MCR 2.505; *Papcum v LR Jacobs Const Co*, 95 Mich App 746, 749; 291 NW2d 191 (1980). A question of law or fact is considered substantial and controlling "if it is a proposition which must be established in order to sustain any one theory of the claim or defense." *Papcum*, 95 Mich App at 749 (citation omitted). "Balancing the benefits against the disadvantages to the court and parties is a matter requiring

sound judicial discretion, and the exercise of that discretion will not be overruled on appeal unless it is clearly abused." *Id*.

The trial court's consolidation of the actions was entirely appropriate. By Dr. Nasir and/or Downriver's own admission, their claims against Dr. Asmi and Dr. Raza had significant overlap in the issue of whether Dr. Raza breached the noncompete clause in his employment agreement and whether Dr. Asmi tortiously interfered with Dr. Raza's employment agreement. By the plain language of MCR 2.505, the trial court is permitted to consolidate *actions* if they have so much as *a* common question that is substantial and controlling regarding *any* theory. Such a common question unambiguously existed.

With respect to whether consolidation was prejudicial, Dr. Nasir/Downriver rely on *Blumenthal v Berkley Homes*, *Inc*, 342 Mich 36; 69 NW2d 183 (1955), to argue that they will be prejudiced if the jury is presented with compounded evidence of Dr. Nasir's alleged misconduct from two separate party-plaintiffs. We disagree.

*Blumenthal* involved eight actions by different plaintiffs seeking various amounts in damages from the defendant for fraud and misrepresentation in the sale of eight different houses at different times. *Blumenthal v Berkley Homes*, *Inc*, 342 Mich 36, 42; 69 NW2d 183 (1955). Our Supreme Court concluded that consolidation was an abuse of the court's discretion that would prejudice the defendant because "each plaintiff would have the benefit of the fraud and misrepresentation accumulated from the evidence produced in all of the cases" *Id*. In contrast, there are only two opposing parties here, those two parties' claims against Dr. Nasir and Downriver are sufficiently distinct that they would not effectively compound each other, and the trial court agreed to issue "special limiting instructions" to resolve any of Downriver's concerns about consolidation. For these reasons, we conclude that the trial court's order of consolidation was proper when entered.

Downriver also argues that case evaluation sanctions against Downriver/Dr. Nasir should be vacated if the Court reverses the bases for the sanction. If the Court does not reverse the bases for the sanction, Downriver contends that it should be vacated nonetheless because the trial court should have applied the "interest of justice" exception or because the court should have held an evidentiary hearing regarding the reasonableness of attorney fees and whether they were "necessitated by" Downriver's rejection of the case evaluation award. In partially reversing the trial court's order dismissing Downriver's breach of contract claim against Dr. Raza, we reverse the bases for case evaluation sanction and order the sanction vacated. Consequently, we need not address Downriver's other asserted bases for vacating the sanctions.

## VI.  CONCLUSION

In conclusion, we reverse the trial court's grant of summary disposition in favor of Dr. Nasir on Dr. Asmi's claim for unjust enrichment. We reverse in part the trial court's dismissal of Downriver's breach of contract claim against Dr. Raza to the extent of Downriver's claim that Dr. Raza violated the exclusivity and accounting provisions of his employment contract, and we

reverse the trial court's dismissal of Dr. Raza's misappropriation of identity counterclaim against Downriver. We vacate the trial court's award of case evaluation sanctions. We affirm otherwise and remand for further proceedings consistent with the Court's opinion. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Kathleen Jansen
/s/ Amy Ronayne Krause