*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VASSAR REAL ESTATE, LLC,

        Plaintiff-Appellant,

v

SWISHER REALTY CO., doing business as
SWISHER COMMERCIAL,

        Defendant-Appellee.

UNPUBLISHED
July 27, 2023

No. 361308
Washtenaw Circuit Court
LC No. 21-000072-CB

Before: CAMERON, P.J., and BORRELLO and O'BRIEN, JJ.

PER CURIAM.

In this action for breach of fiduciary duty involving a real estate transaction, plaintiff appeals as of right the trial court's order granting defendant's motion for summary disposition under MCR 2.116(C)(10). For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

Plaintiff Vassar Real Estate, LLC, is a Michigan limited liability company that was formed in 2015 for the purposes of real estate investment. Vassar is comprised of four member-partners: Dr. Prakash Sarvepalli and his wife, Dr. Sailaja Sarvepalli, as well as Dr. Ashok Vashishta and his wife, Dr. Nisha Vashishta. This lawsuit concerns Vassar's 2019 purchase of a six-acre parcel of vacant land in Scio Township.

In approximately January 2019, Vassar member Prakash[1] found the listing for the subject property and contacted real estate agent Randy Maas. Maas was an agent with defendant Swisher Realty. Vassar had an established relationship with Maas, who had acted as Vassar's real estate agent in multiple previous real estate purchases and as a lease listing agent for Vassar. According

---

[1] We will refer to Vassar members by their respective first names because some of them share last names.

to Prakash, Maas had "been our agent for everything what [sic] we have done in Ann Arbor" because Vassar and its members were located in Mount Pleasant. Prakash[2] testified that he and his partners intended to develop a commercial strip mall on the subject property and that this intention was communicated to Maas. The subject property was zoned for commercial use and listed for sale for approximately $1.5 million. Prakash also testified that Vassar had been looking for a property to purchase in this area and that Maas had previously counseled Vassar against buying certain other properties for various reasons such as issues with "land cuttings," deficient buildable area, and the presence of wetlands.

In February 2019, Charlie Koenn, another Swisher agent, showed Prakash the subject property for the first time because Maas was out of town. It was winter and the property was covered in snow. Prakash did not know at that time that Koenn was also the agent for the seller[3] of the subject property, but he learned of Koenn's role at some point during the process leading up to the purchase.[4]

Koenn testified in his deposition that he told the Vassar representatives at this showing that there was "fill"[5] on the property. Koenn also told Maas that there was fill on the property at some point in February 2019. Prakash testified, however, that Koenn did not discuss the soil or fill issue during this initial showing. According to Prakash, Koenn merely touted the subject property's desirable location, high value, lot size, and development potential. Prakash indicated that he was told that the seller's previous plans to build a car dealership on the subject property had fallen through for financial reasons.[6]

Vassar made an initial formal offer to purchase the subject property on February 20, 2019, for $1,150,000. Maas testified that he acted as the buyer's agent for Vassar, although there was no written agreement between Maas and Vassar. Maas explained that he typically does not execute a written agreement when acting as a buyer's agent in a commercial transaction. The offer included a condition that a Phase I environmental study would be completed. Both Maas and Prakash testified that Maas had recommended adding this condition. Vassar's initial offer was rejected, and Maas encouraged Vassar to raise its offer because of the desirability of the property. Vassar and the seller subsequently agreed to a purchase price of $1.3 million and executed a sales

---

[2] Prakash was also a member or partner in other entities that were involved in commercial real estate transactions.

[3] The seller was Arbor Motors Enterprises, LLC, which was a real estate holding company. Douglass Fox was the sole member of Arbor Motors.

[4] Prakash testified at his deposition that he was not particularly concerned that Swisher agents were representing both parties in the real estate transaction at issue. It does not appear on appeal that Vassar has raised any issue concerning this dual representation.

[5] As will subsequently become clear in this opinion, this so-called "fill" referred to construction debris that was buried in the soil on the subject property.

[6] There was also evidence in the record that the planned automotive dealership was not built due to issues with zoning.

contract. The sales contract also included the condition that it was contingent on obtaining a satisfactory Phase I environmental report at the buyer's expense.

Vassar hired Applied EcoSystems to complete the Phase I assessment. According to Maas, the Vassar members chose this company "on their own." The report, which was completed by early April 2019, indicated that there was debris and groundwater contamination on the property. Prakash testified that he read the report. Subsequently, Vassar asked the seller to obtain soil boring testing. The seller agreed to pay for the soil boring testing to address Vassar's concerns about the soil and what was buried in the soil on the subject property.

Meanwhile, on approximately March 23, 2019, there was a meeting at a Panera Bread restaurant between Vassar members Prakash and Ashok, Maas, and Al Bloom.[7] Bloom was the founder and president of Bloom General Contracting,[8] which performed construction management and general contracting services. The parties refer to this meeting as "the Panera Bread meeting."

Prakash testified that Maas arranged the meeting and recommended Bloom, whom Prakash had not previously met, for purposes of discussing the development of the subject property and building a strip mall. According to Prakash, Maas presented Bloom as someone who was trustworthy and had a lot of commercial construction experience in the local area, including experience in building strip malls. Prakash testified that Bloom estimated that the project would cost approximately $110 to $120 per square foot. However, Prakash acknowledged that the size and design of the structure had not been determined at that point and that Bloom was not able to give a "correct estimate" at that point. Both Prakash and Bloom seemingly agreed in their respective deposition testimonies that this meeting primarily focused on discussing the overall vision for the development and as an "interview" to determine whether Vassar would hire Bloom for the project.

Bloom testified that the subject of construction debris on the parcel came up at this meeting, and he indicated that there was some visible brick and concrete debris on the property. As especially pertinent to this appeal, Bloom was asked at his deposition whether he gave any kind of estimate to the Vassar representatives at the Panera Bread meeting on March 23, 2019, regarding the cost of removing debris, or excavation or fill work; Bloom responded as follows:

> Yes, I don't consider it a cost estimate. There was visibly some brick and cement in the rear of the site, that's the only thing I knew about that site, period.

> When asked how much, well, towards the end of the meeting I think we were standing to leave and the doctors were pressing me to, you know, give them some sort of dollar figure on what it would cost to remove that debris. I said, I have no idea, you know, I have no idea, and they kept pressing and pressing and I said it

---

[7] Bloom's son was also present, but this fact is not material to any of the issues presented on appeal. Al Bloom will be referred to by last name throughout this opinion.

[8] Bloom founded this company in 1985.

could be 50 grand, it could be 80, 90, 100, I don't know, that's that, it's as simple as that and that's all from visible material and who would even know?

I didn't know what they wanted to build. They talked about building a basement maybe. I don't know if they were going to build a medical building with a walk-out basement. They talked about a lot of things at that meeting and they were all over the map and after that meeting there was very hardly any interaction at all. I never heard about it again. I'd drive by the site and I always wondered what they were going to do.

Maas also testified that the topic of debris on the subject property was discussed at the March 23, 2019 Panera Bread meeting. According to Maas, the Vassar representatives asked Bloom how much it would cost to remove the subsurface debris, and Bloom indicated that he did not know. Maas testified that Bloom subsequently estimated that it would cost $50,000 to $100,000 after Prakash pressured him to provide a number. Maas did not have any previous experience with land that had waste or debris that needed remediation.

As Prakash acknowledged, Maas also took Prakash and Ashok to meet with another contractor immediately after the meeting with Bloom. Prakash testified that this other construction company did not show much interest in the project and that there were no further discussions with that company.

With respect to the soil boring that the seller had agreed to obtain, the seller chose to retain Haengel & Associates Engineering, Inc., to complete the testing based on a recommendation from Bloom. Haengel produced a Subsurface Soil Exploration and Geotechnical Report for the property. The report is dated May 12, 2019. In a May 16, 2019 email, Maas provided the Haengel report to Vassar and recommended contacting Bloom to discuss the report.[9] Prakash testified that he read the Haengel report.

The Haengel report stated in relevant part:

"The fill materials vary from sand, clayey sand, sandy clay, and silty clay, with presence of debris, concrete, brick, organics, and roots extending to depths ranging from 9.5 to 12 feet from the existing ground surface. Based on the extent of construction debris and three borings, we believe an old structure with basement was demolished and the area was backfilled with soil and construction debris."[10]

Prakash testified that he discussed his concerns about the findings in the Haengel report with Bloom, pursuant to the recommendation of Maas:

---

[9] Maas admitted at his deposition that he did not actually know whether Bloom was qualified to give a cost estimate for the excavation and fill work recommended in the Haengel report.

[10] This portion of the Haengel report was read into the record during Prakash's deposition.

*Q.* Okay. Did you have any questions of Mr. Maas about the soil boring report?

*A.* Yes, I did.

*Q.* And what did you discuss with him?

*A.* So when we reviewed this soil boring report, it showed there's [a] lot of debris and all those things in the bottom. So I spoke to Randy and Randy told us, you know, the best thing would be to call Al Bloom. And, "This is his number. Why don't you call him?" So I did call him and talk to him about this.

That is when he told me it's no big deal, that is where we can put that mesh foundation or something of that nature to make it happen, and to—just to clean up this whole thing is the same thing that we have talked about. It's not going to get any higher, and we should be able to start the construction anytime.

*Q.* When you say "he"—

*A.* Al Bloom.

Prakash's testimony about exactly when Bloom allegedly provided a remediation estimate of $90,000 and the scope of the work contemplated by that estimate is somewhat unclear. Prakash testified that he had two in-person meetings with Bloom, both of which occurred at Panera Bread. Prakash stated that the March 23, 2019 meeting was the first of these meetings, at which time "[w]e did not know anything about the soil status" and had "never [been] told of anything that this particular piece of land was contaminated or filled or anything of that nature." The second meeting, according to Prakash, occurred at some point in May 2019, after the Haengel report had been received. Prakash appeared to testify that after the soil borings had been completed, Bloom stated that it was " 'not a big deal' " and " 'it's going to cost you approximately around $90,000 to get that soil taken care of, and we should be able to put a strip mall very quickly.' " Prakash also indicated that the $90,000 estimate was "mostly" discussed by Bloom at the second meeting and that Maas was present at the second meeting. Prakash testified both that Bloom provided this estimate directly and that Maas repeated the estimate from Bloom to Prakash in their conversations.

The following exchange also occurred during Prakash's deposition:

*Q.* …Now, what discussions did you have with Mr. Bloom about the fill on the property?

*A.* Done?

*Q.* Now, yes.

*A.* Okay. When we got the—about the situation has come up for the fill and all the things, and what Mr. Al Bloom has mentioned is it is a very simple problem. He told us that he can put some kind of a mesh foundation. I don't know

-5-

what it means. It's a simple mesh foundation that we can do and we can put the construction up. And that is what it's going to cost us, around $90,000 to do it. It's a different kind of construction, putting that foundation or something.

*Q.* Okay. Anything else?

*A.* That's it.

*Q.* Okay. How did the issue of fill even come up?

*A.* After getting the soil boring reports, that is where—that we have been talking about.

*Q.* Okay. You had the soil boring reports after you met with Mr. Bloom, just to let you know. How did it come up with Mr. Bloom in March of 2019 about—

*A.* No; no, not at that time. First time was only the sugar-coating of the project. When we're getting deeper and deeper into the project, that is when they told us about this mesh foundation to be done.

*Q.* Okay. I'm trying to limit the issue right now and the questions that I'm posing to you with regard to this Panera Bread meeting. So at that meeting this mesh foundation didn't come up; correct?

*A.* There are [a] couple of meetings we had—

*Q.* Okay. But Dr. Sarvepalli, you got to listen to my questions. I am limiting my questions right now to the Panera Bread meeting. I want to know everything that was discussed during the Panera Bread meeting. Something that comes up later I don't care about at this point in time. Right now I'm asking about the Panera Bread meeting. Okay?

*A.* Okay.

*Q.* So again, what discussions took place at Panera Bread with Mr. Bloom about the fill on the property?

*A.* There was no[t] too much of a discussion about the fill in Panera Bread. It was only how we can start the construction project, how we can do it. And they were trying to market themselves to—for us to recruit them to—as a builder.

*Q.* Okay. Was there any discussion about fill at the Panera Bread—

*A.* I don't remember.

Prakash admitted in his deposition that he never entered into a contract with Bloom and that if he had hired Bloom, he would have expected that Bloom would have further investigated the property before providing a quote.

-6-

Bloom testified that he remembered talking to Prakash by telephone at some point in April 2019, but he did not recall the substance of that conversation. Bloom also testified that he received the Haengel report and that he "kind of skimmed through it" and read the summary. He did not read the entire report because he had not been hired for the project. Bloom recalled that the report provided suggestions on how to proceed based on the geotechnical analysis and that if he had been hired for the project, he would have consulted a construction engineer because he was unable to "render any opinion on those suggestions." Bloom General Contracting was not in the business of performing excavation or providing fill for sites. Bloom General Contracting would contract with an excavation and fill contractor if necessary, and it had done so in the past. Bloom testified that he never discussed the Haengel report, or any of its proposed options for proceeding with construction on the site, with anyone.

Although the precise details appear unclear, it nonetheless seems that Prakash claimed to have spoken to Bloom at some point after the Haengel report was provided and then discussed this conversation with Maas. Prakash further told Maas that Vassar was ready to close on the subject property and begin construction. According to Prakash, Maas responded by indicating that " '[i]f Al Bloom has said this is what is going to happen, this is what it's going to take to get it fixed, let us get—move forward.' " Prakash also stated that Maas told him " 'it is only going to cost you 90,000 [to] remediate it. I think you should grab it and take it.' " Prakash testified that although "[w]e were . . . trying to get to the point of retaining [Bloom] permanently" for the project, they had not yet obtained a written estimate from Bloom or executed a written contract. Prakash stated that the decision to purchase the subject property was based on Bloom's indication that the remediation of the property would be "very simple." According to Prakash, Bloom did not change his remediation estimate of $90,000 after the Haengel report. Prakash further testified:

> *Q.* Did you ask him if the estimate that he gave you of 90,000 at the Panera Bread meeting would change based upon this soil boring report?
>
> *A.* He said no. I mean, there no—not specific—that specific question, but he said "This can be done."
>
> *Q.* Okay.
>
> *A.* I mean, if you're going to put one single-story building with a mesh foundation or whatever, it can—it's doable.
>
> *Q.* Did you ask him what the mesh foundation would cost?
>
> *A.* Everything including $90,000 extra. That's what it was to clean the land and put the foundation or whatever has to be done.

Prakash acknowledged that the Haengel report specifically recommended that the site preparation should include excavating test pits to determine the extent of the basement backfill and where to properly locate the building. He admitted that there was no test pit excavation conducted by Vassar before purchasing the subject property.

The Haengel report contained three potential remediation alternatives ranging from a more economical and less invasive remediation to a more thorough and more expensive option. The

report also suggested that a combination of these alternatives may be appropriate among various areas on the parcel.

Prakash was asked in his deposition whether he had harbored any concern about purchasing the property as a result of the finding in the Haengel report that the site had been backfilled with soil and construction debris after a building was demolished. He responded:

> *A.* . . . We discussed this soil boring report with my agent. And we have taken him—we got his information; I mean, what he felt about it and all those things. And he said, "You know what? This is just a fill that can be remediated and we can still use this whole land for construction."
>
> *Q.* When you say "agent," who do you mean?
>
> *A.* My agent is Randy Maas.
>
> *Q.* Mr. Maas told you that you could—that he looked as this soil boring report—
>
> *A.* That's what he told me. I didn't sit with him—next to him to see whether he read it or not. We asked him, "What do you think about the soil boring report?" He said, "You know, this can be remediated. It can be fixed. And that's what Al Bloom is mentioning. And we can move forward in the construction."

Vassar lowered its offer to $1.2 million to account for the $90,000 remediation cost. Then Vassar and the seller agreed to split the cost of remediation, and Maas agreed to lower his commission by $10,000. The parties agreed to a final sales price of $1,244,501. Vassar closed on the property on June 14, 2019. The sales contract contained terms that the parties agreed they were not relying on any representation by the broker or broker's agents regarding the fitness or conditions of the property.

At some point in approximately September or October 2019, Vassar discussed the subject property with a different contractor, Kevin Lovell, who had also done some other remodeling work for Vassar. Lovell referred Vassar to E.T. MacKenzie Company for purposes of obtaining a bid to remediate the property. MacKenzie provided a written estimate that it would cost more than $2 million to remediate the subject property. At the time of Prakash's deposition, Vassar had not yet entered into a contract for work on the subject property with either Lovell or MacKenzie. Prakash testified that he and the Vassar partners felt "cheated" and "betrayed." Prakash also admitted that he did not know that MacKenzie's bid was accurate, never asked for a written estimate from Bloom, and did not know whether Bloom and MacKenzie were contemplating the same scope of work. Prakash claimed that it was only after the purchase when Vassar was soliciting bids for the construction that Vassar learned of "[a]ll the land issues, the subsoil issues, the—how the entire team has hidden the facts and sold us a lemon about—in developing the piece of property."

On January 20, 2021, plaintiff Vassar initiated this action against defendant Swisher[11] alleging counts for breach of fiduciary duties and fraudulent misrepresentation. Plaintiff's fraudulent misrepresentation count was subsequently dismissed pursuant to the parties' stipulation. The trial court subsequently granted Swisher's motion for summary disposition of the breach-of-fiduciary-duty claim under MCR 2.116(C)(10). This appeal followed.

## II. STANDARD OF REVIEW

"Whether to recognize a cause of action for breach of fiduciary duty is a question of law reviewed de novo because the existence of a duty is generally a question of law.*" Calhoun Co v Blue Cross Blue Shield Mich*, 297 Mich App 1, 20; 824 NW2d 202 (2012) (citations omitted). A trial court's summary disposition ruling is reviewed de novo to determine whether the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When evaluating a motion under MCR 2.116(C)(10), a court considers the evidence submitted by the parties in the light most favorable to the nonmoving party, and summary disposition is warranted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 120; *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183.

## III. ANALYSIS

"To establish a claim for breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages caused by the breach of duty." *Highfield Beach at Lake Mich v Sanderson*, 331 Mich App 636, 666; 954 NW2d 231 (2020). A fiduciary relationship has been defined as

> "[a] relationship in which one person is under a duty to act for the benefit of the other on matters within the scope of the relationship. Fiduciary relationships—such as trustee-beneficiary, guardian-ward, agent-principal, and attorney-client— require the highest duty of care. Fiduciary relationships [usually] arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer." [*Calhoun Co*, 297 Mich App at 20, quoting *In re*

---

[11] Vassar did not name Bloom or Maas as parties. Vassar relies on Maas's conduct to impute liability to Swisher, although it does not appear that Vassar explicitly claimed that Swisher was vicariously liable for Maas's actions. Nonetheless, like Vassar, we will sometimes refer to Maas as the party alleged to have breached certain duties although we are fully aware that the claims have only been brought against Swisher in this action.

*Karmey Estate*, 468 Mich 68, 74 n 2; 658 NW2d 796 (2003), quoting *Black's Law Dictionary* (7th ed) (alterations in original).]

This Court has also stated that "a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another" and that "[r]elief is granted when such position of influence has been acquired and abused, or when confidence has been reposed and betrayed." *Teadt v Lutheran Church Missouri Synod*, 237 Mich App 567, 580-581; 603 NW2d 816 (1999). "[T]he placement of trust, confidence, and reliance must be reasonable . . . ." *Prentis Family Foundation v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 44; 698 NW2d 900 (2005).

As specifically pertinent to the instant case, a "real estate agent is a fiduciary and it is not permissible for him to act in opposition to his principal." *Mackey v Baker*, 327 Mich 57, 65; 41 NW2d 331 (1950); see also *Brotman v Roelofs*, 70 Mich App 719, 729; 246 NW2d 368 (1976) ("According to Michigan law, a real estate broker is in a fiduciary relationship with his client."). "The duties of loyalty, fidelity, care and disclosure may arise impliedly from the agent's position or out of an express agency contract in a listing agreement." *Brotman*, 70 Mich App at 729. "An agent undertaking any business or the performance of any services for another is disabled in equity from dealing with the subject-matter of the agency upon his own account or for his own benefit, and if he does attempt so to deal in his own name he will be deemed a constructive trustee for his principal." *Mackey*, 327 Mich at 65 (quotation marks and citation omitted).

In this case, Maas was the real estate broker representing Vassar in purchasing the subject property, and he thus owed a fiduciary duty to Vassar. *Mackey*, 327 Mich at 65; *Brotman*, 70 Mich App at 729. Vassar argues on appeal that because there was no dispute regarding the existence of a fiduciary duty and because there were genuine issues of material fact regarding whether that duty was breached in a manner that caused damages, the trial court erred by granting summary disposition.

As is evident from the record evidence, there certainly are disputed questions of fact in this case. In particular, the timing, scope, and definiteness of Bloom's alleged $90,000 remediation estimate appear unclear from the record. Nonetheless, as Swisher properly recognizes in its appellate brief, the *scope* of the fiduciary duty Maas owed to Vassar is disputed in this case even if the parties do not dispute that Maas was in a fiduciary relationship with Vassar. Logically, the scope of the fiduciary duty must be determined, which is a matter of law, before questions of breach, damages, and causation become relevant. See *Highfield Beach at Lake Mich*, 331 Mich App at 666; *Calhoun Co*, 297 Mich App at 20.

Vassar argues that Maas and Swisher had a duty to refer Vassar to a qualified professional who could provide an accurate remediation estimate for the property following the issuance of the Haengel report and, further, to conduct appropriate due diligence on Bloom before referring Vassar to Bloom. Accepting as true, for purposes of reviewing this summary disposition motion, Vassar's contentions that Bloom provided an estimate of $90,000 to remediate the property after receiving the Haengel report, that Maas encouraged Vassar to purchase the property in reliance on Bloom's estimate, and that Vassar's sole additional remediation estimate obtained from E.T. MacKenzie

established the "correct" remediation cost,[12] Vassar's legal theory appears to be that the record demonstrates a breach of the fiduciary duty Maas and Swisher owed because Bloom was inherently unqualified to offer an accurate estimate.

Vassar contends that because Michigan recognizes that real estate brokers have a fiduciary duty to their clients, the duty that Vassar attempts to impose on Maas and Swisher is automatically encompassed within the scope of a real estate broker's fiduciary duty. Vassar does not cite any authority recognizing that a real estate broker's fiduciary duty essentially extends to guaranteeing the accuracy of quotes provided by contractors referred by the broker for work on the property that is the subject of a potential real estate transaction. Hence, this claim of duty could be considered abandoned. "An appellant may not state a position without citing authority and expect this Court to search for grounds to support the claim." *Prentis Family Foundation*, 266 Mich App at 56.

Nonetheless, considering that the question of the scope of a real estate broker's fiduciary duty presents a question of law, Vassar's argument may be resolved on the merits. In doing so, it is instructive to consider the purposes of the relationship between a real estate broker and a client, and the corresponding duties entailed, as stated by our Supreme Court:

> A broker is an agent with special and limited authority, one who is employed by another to negotiate for specific property with the custody of which he has no concern.

> The first and paramount duty of an agent is loyalty to his principal. He that acts fraudulently acts in vain. An agent to purchase hay cannot purchase and get title to hay which he was under obligation to purchase for his principal.

> One occupying a confidential and fiduciary relation to another is held to the utmost fairness and honesty in dealing with the party to whom he stands in that relation.

> Except with the full knowledge and consent of his principal, an agent authorized to buy for his principal cannot buy of himself. An agent authorized to sell cannot sell to himself. An agent authorized to buy or sell for his principal cannot buy or sell for himself; nor can an agent take advantage of the knowledge acquired of his principal's business to make profit for himself at his principal's expense. The same rule applies to leases and other similar transactions.

> \* \* \*

> It is the duty of an agent in all transactions concerning or affecting the subject matter of the agency, to act with the utmost good faith and loyalty to further

---

[12] Notably, Vassar admitted in its trial court briefing that the E.T. MacKenzie quote involved removing more subsurface debris than was absolutely necessary, according to the Haengel report, and that the $2 million remediation quote was probably too high.

the principal's interest. [*Stephenson v Golden*, 279 Mich 710, 735-737; 276 NW 849 (1937) (quotation marks and citations omitted).]

The Court in *Stephenson* further stated:

> The term 'fiduciary' or 'confidential' relation, * * * is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused—in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another.
>
> The existence of such a fiduciary relation as that of principal and agent precludes the latter from taking advantage of his employer or to use any knowledge acquired by such relation to his injury and the personal pecuniary advantage of the agent at his employer's expense. [*Id*. at 739 (citations and some quotation marks omitted).]

It is thus evident that a real estate broker generally has a fiduciary duty to act for the benefit of, and give advice to, the broker's client on matters concerning the negotiations for the purchase or sale of specific real property (depending on whether the broker has been employed to represent a potential buyer or seller). *Calhoun Co*, 297 Mich App at 20; *Mackey*, 327 Mich at 65; *Brotman*, 70 Mich App at 729; *Stephenson*, 279 Mich at 735-737. This fiduciary duty arises out of the relationship created by employing the broker as a representative with respect to a real property transaction and the consequent placing of confidence and trust in the broker's advice and judgment regarding real estate transactions. *Stephenson*, 279 Mich at 735; *Calhoun Co*, 297 Mich App at 20; *Teadt*, 237 Mich App at 580-581. "An agent whether he is engaged to effect a sale or a purchase, his employer is entitled to the benefit of his best judgment, knowledge, and skill . . . ." *Stephenson*, 279 Mich at 756 (quotation marks and citation omitted).

As a fiduciary, the real estate broker may not deal with the subject matter of the agency for the broker's own benefit or otherwise act in opposition to the principal. *Mackey*, 327 Mich at 65. It is clear that the broker's fiduciary duties fundamentally involve loyalty, fairness, and honesty in dealing with the principal, and the primary concern is that the broker should work to advance the principal's interests and refrain from self-dealing or otherwise taking advantage of knowledge acquired through the relationship to make a profit for the broker at the expense of the principal. *Stephenson*, 279 Mich at 735-737, 739. Relief may be granted if the broker betrays the confidence entrusted to the broker or abuses the broker's position. *Stephenson*, 279 Mich at 739; *Teadt*, 237 Mich App at 581. "It is settled law that an agent who has been guilty of fraud in the transaction of his principal's business forfeits his rights to a commission as such." *Stephenson*, 279 Mich at 759.

Here, Vassar's apparent claim that Maas failed to act in Vassar's best interest is predicated exclusively on Vassar's claim that Maas should have referred Vassar to a specific type of contractor, rather than merely a contractor who was undisputedly more knowledgeable than Maas or Vassar's representatives, and that this failure caused Vassar to purchase a property that would require more expensive remediation costs than Vassar anticipated. Vassar's theory essentially

alleges that Maas gave incompetent advice and thus is more akin to negligence than the type of self-dealing or *dishonesty* characteristic of a breach of fiduciary duty claim. See *Case v Consumers Power Co*, 463 Mich 1, 7; 615 NW2d 17 (2000) ("Negligence . . . consists in a want of that reasonable care which would be exercised by a person of ordinary prudence under all the existing circumstances, in view of the probable danger of injury.") (quotation marks and citation omitted; ellipsis in original).[13] "The conduct required to constitute a breach of fiduciary duty requires a more culpable state of mind than the negligence required for malpractice[,]" and "[d]amages may be obtained for a breach of fiduciary duty when a position of influence has been acquired and abused, or when confidence has been reposed and betrayed." *Prentis Family Foundation*, 266 Mich App at 47 (quotation marks and citation omitted).[14]

Vassar additionally argues there were genuine issues of material fact whether Swisher breached its statutory duties under MCL 339.2512d(2). However, in opposing Swisher's motion for summary disposition in the trial court, Vassar limited itself to its common-law fiduciary duty claim and abandoned any claim predicated on MCL 339.2512d by arguing as follows:

> In our case, because there was no "service provision agreement" between Swisher and Vassar - for some reason, Swisher never presented one to Vassar and asked Vassar to sign it - it seems that Vassar probably cannot credibly argue that MCL Sec. 339.2512d imposed any duties on Swisher. But that doesn't matter. It seems clear that the very duties enumerated in that section were imposed on Swisher by common law.

> As this Court has stated:

>> It is well established that "[a] party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error." A waiver is a "voluntary and intentional abandonment of a known right." "A party who expressly agrees with an issue in the trial court cannot then take a contrary position on appeal." " '[A] party is not allowed to assign as error on appeal something which his or her own counsel deemed proper at trial since to do so would permit the party to harbor error as an appellate parachute.' "

---

[13] We express no opinion whether Vassar's theory would present an actionable claim for negligence. This Court has stated that "a negligence claim may advance solely on a claim of economic loss." *Quest Diagnostics, Inc v MCI WorldCom, Inc*, 254 Mich App 372, 381; 656 NW2d 858 (2002). Here, Vassar has clearly pursued a claim for breach of fiduciary duty and has not attempted to frame its theory as a claim for negligence. We merely conclude that Vassar's allegations of what could at most be considered potentially negligent conduct by Maas is legally insufficient to establish a claim for breach of fiduciary duty.

[14] Vassar does not cite any evidence, or advance any argument on appeal, that Maas knew that Bloom's remediation estimate was incorrect, that remediation would actually cost more, or that Maas somehow knowingly sought to provide Vassar with a false estimate of the remediation cost so as to induce Vassar to buy the property and suffer a loss while, somehow, providing a concurrent financial gain to Swisher. Instead, Vassar request this Court infer such a factual scenario from conduct that could be understood as potential negligence.

[*Braverman v Granger*, 303 Mich App 587, 608; 844 NW2d 485 (2014) (citations omitted; alterations in original).]

Thus, Vassar waived any claim of error predicated on the trial court's failure to address whether there was a genuine question of material fact regarding any alleged breach of MCL 339.2512d.

In light of the above conclusions, there is no need to address Vassar's additional arguments that the trial court erroneously imposed a burden of showing adequate due diligence on Vassar and that the provisions of the sales contract did not waive its right to pursue the instant lawsuit against Swisher because the breach-of-fiduciary-duty claim is not predicated on alleged representations about the fitness or condition of the property. Assuming without deciding that Vassar is correct, the trial court still did not err by granting summary disposition in favor of Swisher for the reasons previously discussed.

Affirmed. Defendants having prevailed in full are entitled to costs. MCR 7.219(A).

/s/ Thomas C. Cameron
/s/ Stephen L. Borrello
/s/ Colleen A. O'Brien